RHODE ISLAND HOSPITAL TRUST CO., EX., &c., *vs.* WILLIAM E. COPELAND *et al.*

JULY 6, 1916.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)  *Voluntary Association as Express Trust for Business Purposes.*

An association organized and doing business under a declaration of trust, the beneficial interest under which is divided into transferable shares, the title to the property being in the trustees only who are given the most ample powers of management and control, and are prohibited from binding the shareholders personally; the shareholders not being liable for any assessment; persons contracting with the trustees being required to look to the fund and not to the trustees or stockholders; power being given the trustees to declare

dividends, is in its nature a true trust and not a partnership, and the holders of the "stock," so-called, are not under individual and personal liability for any of the obligations or indebtedness of the trust.

(*2*)    *Express Trust as Business Company.    Liability of Trustee.*

A corporation named as executor and trustee of a decedent may hold shares in an express trust above described, without making itself liable, in its corporate capacity for any obligation or indebtedness of said trust.

(*3*)    *Trusts.    Investments.    Advice to Trustee.*

In the absence of any investigation evidence or knowledge as to the desirability of the retention of such shares by a trustee under a will as a part of the trust fund, the court cannot instruct the trustee as to the course to be pursued, but will if required refer the matter to a master to investigate.

BILL IN EQUITY for instructions.

VINCENT, J.    This is a bill for instructions by the complainant as executor and trustee under the will of William A. Copeland, late of the city of Providence, deceased.

The bill recites that the complainant in its said capacities holds 625 shares of the so-called preferred stock of the Martin-Copeland Company, and that these shares will probably constitute from eighteen to twenty-two per cent. in value of the residuary trust estate.    The Martin-Copeland Company is not a corporation, but is organized and exists by virtue of a written agreement, dated August 8, 1912, which said agreement is as follows:

"AN AGREEMENT AND DECLARATION OF TRUST made the eight (8th) day of August, A. D. 1912, by and between Edgar W. Martin, of Barrington, in the County of Bristol, and William A. Copeland and Lawrence C. Martin, both of Providence, in the County of Providence, all in the State of Rhode Island, and George W. Bleecker, of Chicago, in the County of Cook and State of Illinois, Trustees of the Martin-Copeland Company, for the purpose of enabling the holders of trust shares hereunder to distribute the advantages and risks of their investments over different securities and business enterprises in a way ordinarily possible to investors and to that end to hold as a common or joint investment for the

common and equal benefit of the shareholders, ratably, according to their several holdings of shares, the personal property, transferred or conveyed to, vested in or acquired by the trustees under this Agreement, and to invest and reinvest such money and funds as may be paid to the Trustees or be realized by them from the disposition of shares issued hereunder, in such manner and in such business enterprises, securities and personal property as under the terms of this instrument shall be permissible and in the judgment of the Trustees exercised under the powers given them by this instrument, shall tend to enhance the value of the shares issued hereunder as investments; and the said Trustees hereby Declare that they will hold all property acquired by them at any time as Trustees hereunder, with the proceeds thereof, in trust, to manage and dispose of the same, and to collect, receive and distribute the income and profits thereof, for the benefit of the holders from time to time of the certificates of shares or evidences of interest issued and outstanding hereunder, in the manner and subject to the provisions of this Agreement.

### "Title and Location of Trust.

"(1)    The Trustees of these presents may be collectively designated as "Martin-Copeland Company," and the title of Trustee or Trustees hereunder shall be 'Trustee of the Martin-Copeland Company,' or 'Trustees of the Martin-Copeland Company,' as the case may be, and their principal place of business shall be at Providence aforesaid.

"(2)    The Trustees under this Agreement are the said Edgar W. Martin, William A. Copeland, Lawrence C. Martin and George W. Bleecker, but the term 'The Trustees,' whenever hereinafter used shall mean the Trustee or Trustees hereunder for the time being, whether original or substituted; and any property at any time conveyed, transferred or assigned to the Trustee or Trustees hereunder, or otherwise acquired by them shall be held by them as Trustees under this Agreement.

"(3)   The term 'Shareholder' used in this Agreement shall mean holder of record of the share receipt or share certificate from the Trustees hereunder.

## "Issue of Shares.

"(4)   The Trustees under this Agreement shall as such have power to issue Preferred shares and Common shares of the par value of One Hundred ($100) dollars each.

"The Trustees may issue Preferred shares in an amount which shall not exceed in aggregate Two Hundred Thousand ($200,000) dollars par value and sell the same at public or private sale or exchange for other shares, securities, contracts, services or personal property upon such terms and for such prices and considerations as they may deem expedient.

"The Trustees may issue Common shares in an amount which shall not exceed in aggregate Two Hundred Thousand ($200,000) dollars par value and sell the same at public or private sale or exchange for other shares, securities, contracts, services or personal property upon such terms and for such prices and considerations as they may deem expedient.

"Any Trustee may acquire, hold and dispose of shares in the Trust in his individual name and on his personal account, or jointly with others, or as a member of a firm, without being disqualified to act as Trustee and while so owning and holding such shares on his personal account shall be entitled to the same rights and privileges as any other shareholder.

"(5)   The Trustees shall issue Preferred and Common share certificates in such form as they shall deem best for each sum of One Hundred ($100) dollars or for its equivalent paid to them under this Agreement.   No share certificate shall be issued for any fraction of a share.

## "Transfer of Shares.

"(6)   Every transfer of any share (otherwise than by operation of law) shall be in writing under the hand of the transferor, and upon delivery thereof, with the existing

certificate for such share to the Trustees, or their transfer agent, shall be recorded in the Trust books, and a new certificate therefor shall be given to the transferee, which new certificate and the holder thereof shall thereupon become subject to this Agreement.  In case of a transfer of only a part of the shares mentioned in any certificate, a new certificate for the residue thereof shall be given to the transferor. Until the existing certificate shall be so delivered and transfer recorded, the transferor shall be deemed to be the holder of the share or shares comprised therein for all the purposes of the trust hereof, and the Trustees shall not be affected by any notice of the transfer.

"In case of the loss or destruction of a share certificate issued hereunder as aforesaid, another may be issued in its place by the Trustees, under such conditions as they may deem expedient.

"(7)  Any person becoming entitled to any share in consequence of the death, bankruptcy or insolvency of any shareholder, or in any other way than by a transfer in accordance with the preceding paragraph shall be recorded in the Trust books as the holder of the said share and receive a new certificate for the same upon production of the proper evidence thereof and delivery of the existing certificate to the Trustees, or their transfer agent, which new certificate and the holder thereof shall thereupon become subject to this Agreement.  Until such evidence shall be produced and the existing certificate shall be delivered to the Trustees, they shall not be affected by any notice of the change in title.

## "Title of Shares.

"(8)  All shares shall give only the rights in this Agreement and in certificate thereof specifically set forth, and a shareholder, or upon the death, bankruptcy or insolvency of any shareholder, the person or persons succeeding to his interest as legal representatives, assignees or otherwise, shall have no right to call for any accounting or division of property or profits.

"General Powers and Duties of Trustees.

"(9)  The Trustees under this Agreement shall have the sole legal title to all property in any part of the United States of America, or in any foreign country, at any time held, acquired, or received by them as Trustees under the terms of this Agreement, or in which the shareholders under this Agreement shall have any beneficial interest as such shareholders, and they shall have and exercise the exclusive management and control of the same, in any manner that they shall deem for the best interests of the shareholders, with all the rights and powers of absolute owners thereof. They may sell, exchange, mortgage, pledge, or in any other way dispose of, or deal with the property of the trust, or any part thereof, or interest therein, upon such terms as they see fit, and take in payment or exchange therefor, cash, securities, property or notes, and obligations of any kind or description; may adopt and use a common seal; may manufacture, buy, sell and otherwise deal in, precious stones, chains, jewelry, lenses, optical goods and kindred articles, machinery, materials, and articles of all kinds which shall be capable of being used for such purposes, and may purchase or otherwise acquire patents, patent rights and privileges, trade marks and trade names and improved or secret processes that are in any way related to any of the objects aforesaid and grant licenses for the use of or of selling or otherwise dealing in any patent rights and privileges, trade marks and trade names and improved or secret processes acquired by them, and for these purposes use any moneys and property in their hands; and generally make all contracts, and do all things which they may think desirable in the management, development and maintenance of the Trust properties and shall deem for the best interests of the shareholders.  They may sell, discount or otherwise negotiate notes, commercial paper and obligations of all kinds coming into their hands and may borrow on notes or bonds of the Trust, or otherwise, either without security, or secured

by the pledge or mortgage with power of sale of the assets of the trust, as they deem best, such sums from time to time as they require, and they shall have full power to execute all contracts, mortgages and agreements or instruments in writing, and to do any other things which they shall think proper for executing any of the powers or trusts herein contained, subject only to the provisions and purposes of this agreement, and shall have full power to perform and fulfill all agreements and obligations and pay all liabilities properly assumed by them as such Trustees.

"(10)   The Trustees may make, adopt, amend or repeal such By-Laws, rules and regulations not inconsistent with the terms of this Agreement as they may deem necessary or desirable for the conduct of their business, and for the government of themselves and their agents, servants and representatives.

"(11)   The Trustees shall have power to represent the shareholders in all suits or legal proceedings in any court of law or equity, or before any other body or tribunal, to employ counsel and commence suits or proceedings or defend the same, and to compromise or submit to arbitration all matters of dispute in which the Trust or Trustees may be a party, whenever and in such manner as they in their judgment may deem proper.

"(12)   The Trustees shall have power to invest and reinvest all funds and moneys of the Trust in their hands, in merchandise, in stocks and bonds, any other securities and personal property, and at any time to sell, transfer and dispose of, without further authority or consent than herein contained, any property acquired by them, at their discretion, and upon such terms and for such prices and considerations as they deem wise, and reinvest the proceeds of such sales, upon such terms and conditions as they may deem expedient.

"(13)   The Trustees shall have power to pay the expenses of organization of this Trust, including all legal expenses in connection with the preparation and carrying out of the plan

for the formation of the Trust and the acquisition of property acquired hereunder; to indemnify themselves or any of them out of the property of the Trust for all liabilities for which they or any of them may be personally liable in the carrying out of the trusts herein contained; to pay the necessary and proper expenses of the carrying on of the business of and management of the Trust hereunder, and to employ such officers, experts, counsel, managers, salesmen, agents, mechanics, workmen, clerks, bookkeepers, accountants, or other persons, as they think best, and fix their compensation and define their duties, and any Trustee so employed may receive compensation therefor.

"(14) The Trustees shall have power to determine whether moneys or things shall, for the purpose of these presents, be considered as capital or income, and what constitutes gross income and what net income in any year or part of a year, and to determine the mode in which any expenses or outgoings shall be borne as between capital and income.

## "Number, Absence and Incapacity of Trustees, and Vacancies.

"(15) The Trustees shall not be more than four in number. The Trustees may designate one of their number to act as President and one to act as Treasurer, and may change such designations, which officers shall have the authority and shall perform the duties usually incident to these offices in case of corporations so far as practicable, shall have authority to sign share certificates issued hereunder, and shall have such other authority and perform such other duties as may from time to time be determined by the Trustees.

"A majority of the Trustees constitutes a quorum and the concurrence of all the Trustees shall not be necessary to the validity of any action done by them, but the wish of a majority of the Trustees present and voting at any meeting shall be conclusive.

"Any vacancy in the number of Trustees caused otherwise than by the removal of any Trustee or Trustees by the common shareholders, may be filled by the remaining Trustee or Trustees, by an instrument in writing and in case of the removal of a Trustee by the Common shareholders as provided in the following paragraph of this Agreement, the vacancy shall be filled only by the Common shareholders.

"(16)    The Common shareholders may, by vote of the majority of shares then outstanding, at a meeting duly called for that purpose, as provided in paragraph twenty-one hereof, remove any Trustee and appoint a new Trustee in his stead.

"(17)    The Trustee or Trustees for the time being shall have all the powers of the original Trustees.

"(18)    In case of any vacancy in the office of Trustees or the incapacity or neglect or refusal to execute the duties reposed in him of any Trustee for any reason, or the absence from this country of any Trustee for a period of thirty (30) days or more, the remaining or other Trustee or Trustees shall have and exercise the powers and be subject and holden to perform all the duties of all the Trustees so long as such vacancy or absence continues, or such incapacity, neglect or refusal exists and the certificate of any remaining Trustee, shall be conclusive evidence of such vacancy, absence, neglect, incapacity or refusal.

"(19)    Upon the resignation, decease, removal or permanent incapacity of any Trustee or Trustees hereunder, or vacancy for any cause in the office of Trustee, the title of such Trustee or Trustees, shall vest in the other or remaining Trustee or Trustees without any conveyance whatsoever; and upon the filling of any vacancy, or the appointment of any new or additional Trustee or Trustees hereunder by the Common shareholders, or otherwise, as is hereinbefore provided, the title of the Trust property shall at once vest in the then Trustees for the time being without any conveyance whatsoever.

"(20)   The Trustees may by vote or otherwise delegate to any one or more of the Trustees any of their powers herein and any Trustee may by written power of attorney delegate his power to any other Trustee or Trustees herein.

### "Meetings of Shareholders.

"(21)   The Trustees may call meetings of Common shareholders at any time and shall do so upon the written request, stating the purpose for which such meeting shall be called of holders of twenty-five per cent. of all Common shares outstanding, and in case of the incapacity, neglect or refusal of the Trustees to call such meeting within a reasonable time after the receipt of such request therefor, the meeting may be called by the Common shareholders, signing said request, who may do all things necessary therefor required in the following paragraph, or otherwise.

"(22)   A written or printed notice of every meeting of Common shareholders, stating the time and place of the meeting, and the purposes thereof, shall be given to each Common shareholder by the Trustees at least seven (7) days before a meeting, by leaving such notice with him or by mailing it, post-paid, to the address last given by him to the Trustees, or in case he had given no address to the Trustees, to his last known place of business or abode.

"(23)   Notices of meetings, or calls for payments or subscriptions, or notices or calls for any other purpose, shall be deemed binding upon each shareholder, if made as provided in the preceding paragraph.

"(24)   Common shareholders may vote by proxy, and for the purpose of voting at meetings, each Common share shall be entitled to one vote.

"(25)   No business shall be transacted at any meeting of the Common shareholders, unless notice of such business has been given in the call for the meeting, and no business, except to adjourn, either generally or to a time assigned, shall be transacted at any meeting of the Common shareholders unless the holders of forty (40) per cent. of all the shares outstanding are present in person or by proxy.

"(26) A certificate signed by one or more of the Trustees, or if the office be vacant, or the Trustee or Trustees for the time being be unable, neglect or refuse to act, by the holders of twenty-five per cent. of all the Common shares outstanding shall be conclusive evidence of the regularity of any meeting, of any vote passed, or other proceedings at such meeting, and of all facts in relation to such meeting stated in such vote or certificate.

## "Compensation.

"(27) The Trustees shall fix the compensation, if any, of all officers and agents who they may appoint and are likewise authorized to pay to themselves such compensation for their services as Trustees as they may deem reasonable and any Trustee may be employed by the Trustees to perform any special business, financial or other service and shall in such case be entitled to receive such additional compensation as the Trustees may fix and determine.

## "Liability of Shareholders and Trustees.

"(28) Shareholders hereunder shall not be liable for any assessment, and the Trustees shall have no power to bind the shareholders personally.

"(29) Every act done, power exercised, or obligation assumed by the Trustees, pursuant to the provisions of this Agreement, or in carrying out the trusts herein contained, shall be held to be done, exercised or assumed, as the case may be, by them as Trustees and not as individuals, and every person or corporation contracting with the Trustees, as well as every beneficiary hereunder, shall look only to the fund and property of the Trust for payment under such contract, or for the payment of any debt, mortgage, judgment or decree, or the payment of any money that may otherwise become due, or payable on account of the trusts herein provided for, and any other obligation arising under this Agreement in whole or in part; and neither the Trustees nor the shareholders present or future, shall be personally liable therefor.

"(30)   No bond or surety or sureties shall be required of any Trustee acting hereunder, and each Trustee shall be liable only for his own acts, and then only for wilful breach of trust.

"Liability for Application of Money Paid to Trustees.

"(31)   No purchaser, mortgagee, lender, lessee, or other person, shall be bound to see to the application of any money paid by him to the Trustees.

"Dividends.

"(32)   The Trustee may from time to time declare and pay to the Preferred and Common shareholders dividends out of the net earnings from time to time received by them, but the amount of such dividends and the payment of them shall be wholly in the discretion of the Trustees, except that any dividend which may be declared on the Preferred shares shall be at the rate of six per cent. per annum, and no more, and the same shall be paid and set apart before any dividend shall be paid or set apart for the Common shares.

"Reserve or Surplus Fund.

"(33)   The Trustees shall have authority to reserve in each year such sum as they deem wise from the gross or net income actually collected, as a reserve or surplus fund, with power to use said fund by the Trustees at any time for the maintenance of dividends, for the payment of the charges of the Trustees, or to treat the same or any part thereof as surplus capital, and to change their determination as to said fund, or any part thereof, from time to time, as to them may seem prudent and expedient, absolutely at their own discretion, but always subject to the terms of this Agreement.

"Inspection of Books.

"(34)   The Transfer books of the Trust shall be open to the inspection of shareholders at all reasonable times.

## "Amendment of Agreement.

"(35)   This Agreement and Declaration may be amended or altered, except as regards the liability of the Trustees and shareholders and the provisions relating to the Preferred shares, with the consent of the Trustees for the time being, provided any such proposed amendment or alteration shall be authorized and approved at a meeting of the Common shareholders, by at least two-thirds of all the Common shares outstanding, and notice of the proposed amendment or alteration shall have been given in the call for the meeting, but no alteration or amendment shall affect any person not having notice thereof, nor shall any alteration or amendment, or other action affect previously acquired rights of any third person other than shareholders hereunder.

## "Acknowledgment of Certificates.

"(36)   Any certificate or paper signed by the Trustees, or any of them, or by the Common shareholders hereunder, or a copy of the record of any of the proceedings of the Trustees or shareholders, which it may be deemed advisable to record in any Registry of Deeds, or elsewhere, may be acknowledged by any one of the parties signing in the manner at the time prescribed by law for the acknowledgment of deeds to be recorded in such registry.

## "Termination of Trust.

"(37)   The trusts under this Agreement may be terminated at any time by vote of two-thirds of the Common shareholders hereunder at a meeting duly called for that purpose, as hereinbefore provided in paragraphs twenty-one and twenty-six of this Agreement.

"(38)   Unless the Trusts under this Agreement shall be sooner terminated, as hereinbefore provided, they shall continue for twenty-one (21) years after the death of the last surviving original Trustee hereto, and of Wesley C. Martin and E. Cornell Martin, sons of the aforesaid Edgar

W. Martin, Trustee hereof, and at the expiration of the time so limited for such continuance of the said trusts, they shall terminate.

"(39)  Upon the termination of the Trusts under this Agreement by the expiration of time, or for any other cause, the Trustee shall sell the Trust property at either public or private sale and liquidate its assets; the proceeds of the liquidation shall be first applied to the payment of the holders of Preferred shares of the sum of one hundred dollars per share and any accrued and unpaid dividends thereon, and the balance remaining thereafter shall be divided among the holders of Common shares in proportion to the holdings.

### "Acceptance of Trustees.

"(40)  Edgar W. Martin, William A. Copeland, Lawrence C. Martin and George W. Bleecker aforesaid, herein named as Trustees, hereby signify their acceptance of the trusts herein set forth.

"In Witness Whereof, the said Trustees have hereunto set their hands and seals on the day and year first above written.

"Witnesses:                    *Edgar W. Martin* (Seal)
*Russell W. Wright*            *William A. Copeland*
*Russell W. Wright*           *Lawrence C. Martin*
*Russell W. Wright*            *George W. Bleecker.*"

William A. Copeland deceased on March 14, 1913, leaving a last will and testament. By this will the complainant was appointed executor and also trustee under certain trusts thereby created. The property thus placed in trust includes the 625 shares in the Martin-Copeland Company. The complainant duly qualified as executor and has now reached the point in its administration of the estate where it is ready to transfer the residue to itself as trustee.

At this juncture the complainant alleges that it has become uncertain as to some questions involving the interpretation

of the agreement of August 8, 1912, under which the Martin-Copeland Company was organized, and especially as to the liability of the holders of the so-called preferred stock thereof; the liability of the trustee when it shall come to hold the same under the trusts imposed by the will of William A. Copeland, and as to the proper management and disposition of such stock by the trustee after it shall have been duly transferred to it, and has formulated its request for instructions as follows: "a.  Whether under said agreement the persons interested therein, the holders of the so-called preferred stock, are or are not under individual and personal liability for any of the obligations or indebtedness of the said trust or association, and if so whether the general estate of the said William A. Copeland beyond the amount represented by said shares remains and will remain liable until a transfer of said shares.

"b.  Whether your orator as executor or trustee can continue to hold said shares of so-called preferred stock without making itself liable in its own corporate capacity for any obligation or indebtedness of said trust or association.

"c.  Your orator is further in doubt whether, even if it will incur no personal liability under said agreement, it is proper for it to continue to hold as trustee all of said shares of stock or any part of them, or whether it ought to convert into cash the whole or some part thereof and reinvest the proceeds in other trust securities."

The first question to be determined is whether those interested in the business of the Martin-Copeland Company, called stockholders, are personally liable to creditors as copartners.  In other words, is the Martin-Copeland Company a copartnership and the several holders of shares therein individually liable for its debts or is it a true trust where such holders are only *cestuis que trustent?*

In considering this question we must first look to the terms of the agreement of August 8, 1912.  It is entitled "An Agreement and Declaration of Trust."  It commences with a declaration of trust and its further provisions em-

braced in some forty paragraphs may be briefly summarized.

The name of the company is fixed, provision is made for the issue of shares, preferred and common, to be represented by certificates; the trustees are authorized to acquire, hold and dispose of shares in the same manner as though they were not trustees; the shares are made transferable both by act of the party, owner or by operation of law; the shareholders' rights are defined; title to the property is to be in the trustees only; they are given the most ample powers to deal with the property forming the subject-matter of the trust; they are authorized to make by-laws and regulations; to represent the shareholders in legal proceedings; to indemnify themselves or any of them from the trust property for liabilities incurred in the carrying out of the trust; to determine what is income and what is capital for the purposes of the trust.

The number of trustees is fixed at not more than four. They are authorized to appoint officers; the authority of the officers is outlined; provision is made for the appointment of new trustees and for authority to one or more of the trustees to delegate their powers to another of the trustees. They are authorized to call meetings of the common shareholders at any time they see fit and are required to do so on request of the holders of twenty-five per cent. of the common shares outstanding. Provision is made for the warning of meetings of the common shareholders; for the voting at such meetings by proxy and for share votes, forty per cent. of the outstanding common shares being required for a quorum.

The trustees are empowered to fix the compensation of officers and agents; they are especially prohibited from binding the shareholders personally and the latter are not to be liable for any assessment. The trustees' acts within the powers conferred by the agreement and declaration are done as trustees and not individually and persons contracting with the trustees are required to look to the fund and not to the trustees personally, nor to the stockholders for payment.

No bond is required of any trustee and each is liable only for his own wilful breach of trust. Anyone paying money or other property to the trustees is not required to see to the application of the money or property.

The trustees are given power to declare dividends on both classes of shares, but the amount and payment of them is in the sole discretion of the trustees, except that preferred dividends shall be at the rate of six per cent. per annum, and no more, and they have priority over common dividends. They are empowered also to create a reserve or surplus fund.

Provision is made for amending the agreement and declaration on certain conditions and in a certain manner. The trusts may be terminated by two-thirds vote of the common shareholders and they are limited in any event to twenty-one years after the death of certain identified persons. Thereupon the affairs of the trust are to be wound up in a specified manner.

The respondents have in their brief referred to and commented upon some of the earlier English cases in which the sharing of profits was the test applied in determining whether or not a partnership existed. While these cases are interesting and instructive they do not demand any particular notice at this time.

In the year 1860 the case of *Cox* v. *Hickman,* 8 H. of L. 268, after having passed through the inferior courts where the old "sharing profit" test had been applied and a partnership found to exist, reached the House of Lords for final decision. The decision was unanimous. Lord Cranworth said in his opinion: "The liability of one partner for the acts of his co-partner is in truth the liability of a principal for the acts of his agent," and Lord Wansleydale said: "The law as to partnership is undoubtedly a branch of the law of principal and agent; and it would tend to simplify and make more easy the solution, the questions which arise on this subject, if this true principle were more constantly kept in view."

Though the case of *Cox* v. *Hickman* may have brought into existence the test of principle and agent as embodied in a

judicial decision, such test had long before been suggested for we find in Story on Partnership, Section 1 (1841), "Every partner is an agent of the partnership; and his rights, powers, duties, and obligations, are in many respects, governed by the same rules and principles, as those of an agent. A partner, indeed, virtually embraces the character both of principal and of an agent."

In *Cox* v. *Hickman*, Smith & Son, ironmongers, etc., were embarrassed. A creditors' meeting was held. The creditors could force bankruptcy and through a trustee take possession of the plant and business. Instead they elected five trustees, who took over the plant and business and ran the same for the creditors with a provision for its being turned back to Smith & Son when the creditors were paid. Two persons named as trustees, the defendants, who were also creditors, refused to act as trustees. A debt was contracted by the acting trustees. It was represented by a promissory note. The note was not paid. Suit was brought against the defendants to charge them as partners because of their signing the deed and agreeing to take the profits of the business as conducted by the acting trustees and upon this point Lord Cranworth said: "I have hitherto considered the case as it would have stood if the creditors had been merely passively assenting parties to the carrying on of the trade, on the terms that the profits should be applied in liquidation of their demands. But I am aware that in this deed special powers are given to the creditors, which, it was said, showed that they had become partners, even if that had not been the consequence of their concurrence in the previous trust. The powers may be described briefly as, first, a power of determining by a majority in value of their body, that the trade should be discontinued, or, if not discontinued, then secondly, a power of making rules and orders as to its conduct and management.

"These powers do not appear to me to alter the case. The creditors might, by process of law, have obtained possession of the whole of the property. By the earlier pro-

visions of the deed, they consented to abandon that right, and to allow the trade to be carried on by the trustees. The effect of these powers is only to qualify their consent. They stipulate for a right to withdraw it altogether; or, if not, then to impose terms as to the mode in which the trust to which they had agreed should be executed; I do not think that this alters the legal condition of the creditors. The trade did not become a trade carried on for them as principals, because they might have insisted on taking possession of the stock, and so compelling the abandonment of the trade, or because they might have prescribed terms on which alone it should be continued. Any trustee might have refused to act, if he considered the terms prescribed by the auditors to be objectionable. Suppose the deed had stipulated, not that the creditors might order the discontinuance of the trade, or impose terms as to its management, but that some third person might do so, if, on inspecting the accounts, he should deem it advisable; it could not be contended that this would make the creditors partners, if they were not so already; and I can see no difference between stipulating for such a power to be reserved to a third person, and reserving it to themselves." ...

In the case of *Wells Stone Co.* v. *Grover,* 7 N. D. 460 (1898), where the situation was practically the same as the case at bar, the court said: "The trustee doubtless was accountable in equity for the faithful discharge of his duties as such trustee, and a Court of Equity might in a proper case interfere. But while the business was being managed by the trustee he was absolute master thereof,—as much as though he himself had a beneficial interest therein. The assignor could not dictate how the trustee should conduct it, what purchases or sales he should make, or have the slightest voice in its affairs. It was the business of the trustee, so long as the trust continued; the assignor having only an indirect interest in the successful management thereof. He was not the proprietor of the business, and the trustee was not his agent. It is always the case that the trustee has

no interest in the management of the affairs confided to him by the trust instrument, and that the *cestui que trust* is the only person beneficially interested therein. And yet it has never been held or even supposed that the beneficiary is liable for debts contracted by the trustee in so handling the trust property as to create an income for such beneficiary."

In *Smith* v. *Anderson*, 15 Ch. Div. 247 (1880), a case involving questions similar to the case at bar, James, L. J., said in overruling the Master of the Rolls: "I cannot find that this deed constitutes any association whatever between the persons who are supposed to be the *socii*. One man goes with ninety pounds in his hands and buys from the trustees a certificate for one hundred pounds with all the chance of profit attaching to it. Another man goes the next day and takes his ninety pounds to the same people and gets from them another certificate, by which he gets a right to share in the funds which they have in their hands. The first man knows nothing of the second, and the second knows nothing of the first; they have never come into any arrangement whatever as between themselves. There never has been anything creating any mutual rights or obligations between these persons. They are from the first entire strangers who have entered into no contract whatever with each other, nor has either of them entered into any contract with the trustees or any trustee on behalf of the other, there being nothing in the deed pointing to any mandate or delegation of authority to anybody to act for the certificate holders as between themselves, and nothing, as it appears to me, by which any liability could ever be cast upon the certificate holders either as between themselves or as between themselves and anybody else. Therefore, I cannot arrive at the conclusion that the certificate holders form an association within the meaning of the Act of Parliament."

Justice Brett said: "I now come to the case of the certificate holders. . . . But supposing that this was such a business as is mentioned in the Act, were the certificate holders the persons who were to carry it on? It seems to

me that they certainly were not.   I take it that the persons called trustees in the deed are clearly trustees as distinguished from agents and from directors. . . . If, indeed, although they were called trustees, the duties which they had to perform were really those of directors, then, although they were called trustees, the legal effect of the deed would be that they would be directors and if they are directors, they are agents; but here it seems to me clear that according to the true construction of the deed they were not directors or agents, but trustees.   If that be so, the certificate holders, even if they were associated at all, were not associated for carrying on the business.   It was not their business.   They could not have been made liable for any contract made by the trustees.   It was of course urged that they would be liable as undisclosed principals.   But that assumes that the persons who made the contracts upon which they are to be liable are their agents, authorized to bind them by their contracts, which is obviously not true."

To this may be added a brief extract from the opinion of Cotton, L. J., in the same case.   "All the power which the subscribers of this money had was to attend sometimes at meetings. . . .   The only business done at them was to receive and consider a report from the trustees on the condition and affairs of the trust, to appoint auditors to audit the accounts, and to elect new trustees to fill up vacancies. It is impossible, in my opinion, to say that the certificate holders are by themselves in any way carrying on any business by reason of what is done at these meetings. . . . Really all that is here given to the certificate holders is the power to give such consent as *cestui que trusts* usually give for a change of security."

Coming now to the consideration of later cases involving the question as to what constitutes a partnership and what a true trust, the court finds in *Williams* v. *Milton*, 215 Mass. 1, that there is a partnership relation when the certificate holders are associated together by the terms of the "trust" and are the principals whose instructions are to be obeyed

by their agent, who for their convenience holds the legal
title to their property, the property being their property
and they being the masters.   On the other hand if there is no
association between the certificate holders, the property is
the property of the trustees and the trustees are the masters.
Then the certificate holders have only a right to have the
property managed for their benefit.   They have no right
to manage it themselves nor to instruct the trustees how to
manage it for them and it becomes a true trust.   As the
court further said, quoting from *Mayo* v. *Moritz,* 151 Mass.
481, 484: "The scripholders are *cestuis que trust,* and are
entitled to their share of the avails of the property when the
same is sold," and that is all to which they were entitled.
"In *Mayo* v. *Moritz* the scripholders had a common interest
in the trust fund in the same sense that the members of a
class of life tenants and the members of a class of remainder-
men, among whom the income of a trust fund and the *corpus*
are to be distributed respectively, have a common interest.
But in *Mayo* v. *Moritz* there was no association among the
certificate holders just as there is no association, although
a common interest, among the life tenants or the remainder-
men in an ordinary trust.   .  .   .   The certificate holders
as *cestuis que trustent,* as they are called in the trust deed, have
a common interest in precisely the same sense that members
of a class of life tenants (among whom the income of a trust
fund is to be distributed) have a common interest, but they
are not *socii*; and it is the trustees and not the certificate
holders who are the masters of the trust property.   The
sole right of the *cestuis que trust* is to have the property
administered in their interest by the trustees who are the
masters; to receive income while the trust lasts and their
share of the *corpus* when the trust comes to an end."   See,
also, *Hussey* v. *Arnold,* 185 Mass. 202; *Makin* v. *The Savings
Institution at Portland,* 23 Maine, 350; *Burt* v. *Lathrop,* 52
Mich. 106.

When we examine the agreement of August 8, 1912, under
which the Martin-Copeland Company was organized, in the

light of the authorities which we have cited, we cannot escape the conclusion that such agreement evidences both in intention and in law a true trust and not a partnership.

It is therefore our decision that under said agreement, the persons interested therein, the holders of the so-called preferred stock are not under individual and personal liability for any of the obligations or indebtedness of the said trust or association; that the estate of William A. Copeland will not be liable for the obligations or indebtedness of said trust or association, beyond the amount represented by the shares belonging thereto, and that the complainant as executor or trustee can continue to hold said (2) shares of so-called preferred stock without making itself liable in its own corporate capacity for any obligation or indebtedness of said trust or association.

We are asked to further instruct the complainant as to whether it is proper for it to continue to hold as trustee all of said shares of stock or any part of them, or whether it ought to convert into cash the whole or some portion thereof and reinvest the proceeds in other trust securities.

In this connection the complainant calls the attention of the court to the case of *Peckham* v. *Newton*, 15 R. I. 321, in which the court said: "The bill assumes that an investment in such bonds and stocks, whatever their character, is an improper investment for trust funds. We think this is a stricter rule than has ever been applied in this State to investments already existing. We have no statute law or rule of court which points out any particular classes of securities for trust investment. It is true that the court regards safety as paramount to profit, but nevertheless, if safety and profit can be combined, neither should be unnecessarily sacrificed. Trustees must be prudent and vigilant and exercise a sound judgment. They are 'to observe how men of prudence, discretion, and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of the capital

to be invested.' *Harvard College* v. *Amory,* 9 Pick. 446, 461. The fact that the bonds and stocks were bought and held by the testator, commends them for retention so long as there is no doubt of their safety.   1 Perry on Trusts, § 465. Of course any of them which are unsafe, if any such there are, ought to be sold; but in our opinion such as are safe, as prudent men well informed and skilful in the matter of investment understand safety, should be retained for the benefit of the legatees.   The court cannot instruct the trustees more definitely without fuller information, and if the trustees are still in doubt as to their duty, after what we have said, we must refer the matter to a master for investigation."

(3) We think the same situation is presented here.   We are not sufficiently informed to do more than to state some very general and well understood principles which should govern trustees in the management of trust property.   In the absence of any investigation, evidence or knowledge as to the desirability of retaining these shares as a part of the trust fund we cannot intelligently instruct the complainant as to the course which it should pursue regarding them. It is possible that these shares could only be sold at so great a reduction from their face value or even their actual value that it would be wise to retain them and take the risk of their later depreciation, while on the other hand there might be circumstances which would make an immediate sale the more expedient course.   There is no prayer in the bill asking for the appointment of a master to investigate and report upon this matter, but if the complainant is still in doubt and feels that it requires the further assistance of the court the way is open for the appointment of a master who can make the necessary investigation and through whom the court may be sufficiently informed to intelligently give instruction.

The cause is remanded to the Superior Court with our decision certified thereon for further proceedings.

*Tillinghast & Collins,* for complainant.

*Comstock & Canning, Patrick P. Curran,* of counsel, for Mary Louise Markey and Gertrude E. Copeland, Ex.

*Mumford, Huddy & Emerson, Charles C. Mumford,* of counsel, for Rhode Island Hospital.

*Greenough, Easton & Cross,* for Young Women's Christian Association.