Robert B. DENNIS, etc., et al.,
Plaintiffs, Appellees,

v.

RHODE ISLAND HOSPITAL TRUST
NATIONAL BANK, Defendant,
Appellant.

Robert B. DENNIS, etc., et al.,
Plaintiffs, Appellants,

v.

RHODE ISLAND HOSPITAL TRUST
NATIONAL BANK, Defendant,
Appellee.

Nos. 84–1084, 84–1149.

United States Court of Appeals,
First Circuit.

Argued June 5, 1984.

Decided Sept. 28, 1984.

John L. Warden, New York City, with whom Robert J. Lack, Richard E. Simpson, Sullivan & Cromwell, Edwin H. Hastings, Edward J. Regan, Peter J. McGinn, and Tillinghast, Collins & Graham, Providence, R.I., were on brief, for Rhode Island Hospital Trust Nat. Bank.

Gerard A. Dupuis, New York City, with whom Barbara T. Barrantes, New York City, Peter J. McNamara, Baltimore, Md., Paul P. Baillargeon, Woonsocket, R.I., and Ober, Kaler, Grimes & Shriver, New York City, were on brief, for Robert B. Dennis, etc., et al.

Before COFFIN and BREYER, Circuit Judges, and DOYLE,* Senior District Judge.

BREYER, Circuit Judge.

The plaintiffs are the great-grandchildren of Alice M. Sullivan and beneficiaries of a trust created under her will. They claimed in the district court that the Bank trustee had breached various fiduciary obligations owed them as beneficiaries of that trust. The trust came into existence in 1920. It will cease to exist in 1991 (twenty-one years after the 1970 death of Alice Sullivan's last surviving child). The trust distributes all its income for the benefit of Alice Sullivan's living issue; the principal is to go to her issue surviving in 1991. Evidently, since the death of their mother, the two plaintiffs are the sole surviving issue, entitled to the trust's income until 1991, and then, as remaindermen, entitled to the principal.

The controversy arises out of the trustee's handling of the most important trust assets, undivided interests in three multistory commercial buildings in downtown Providence. The buildings (the Jones, Wheaton-Anthony, and Alice Buildings) were all constructed before the beginning of the century, in an area where the value of the property has declined markedly over the last thirty years. During the period that the trust held these interests the buildings were leased to a number of different tenants, including corporations which subsequently subleased the premises. Income distribution from the trust to the life tenants has averaged over $34,000 annually.

At the time of the creation of the trust in 1920, its interests in the three buildings were worth more than $300,000. The trustee was authorized by the will to sell real estate. When the trustee finally sold the buildings in 1945, 1970, and 1979, respectively, it did so at or near the lowest point of their value; the trust received a total of only $185,000 for its interests in them. These losses, in plaintiffs' view, reflect a serious mishandling of assets over the years.

The district court, 571 F.Supp. 623, while rejecting many of plaintiffs' arguments, nonetheless found that the trustee had failed to act impartially, as between the trust's income beneficiaries and the remaindermen; it had favored the former over the latter, and, in doing so, it had reduced the value of the trust assets. To avoid improper favoritism, the trustee should have sold

---

* Of the Western District of Wisconsin, sitting by designation.

the real estate interests, at least by 1950, and reinvested the proceeds elsewhere. By 1950 the trustee must have, or should have, known that the buildings' value to the remaindermen would be small; the character of downtown commercial Providence was beginning to change; retention of the buildings would work to the disadvantage of the remaindermen. The court ordered a surcharge of $365,000, apparently designed to restore the real value of the trust's principal to its 1950 level.

■ On appeal, plaintiffs and defendants attack different aspects of the district court's judgment. We have reviewed the record in light of their arguments. We will not overturn a district court's factual determination unless it is "clearly erroneous," Fed.R.Civ.P. 52(a). And, in a diversity case such as this one, involving a technical subject matter primarily of state concern, we are "reluctant to interfere with a reasonable construction of state law made by a district judge, sitting in the state, who is familiar with that state's law and practices." *Rose v. Nashua Board of Education*, 679 F.2d 279, 281 (1st Cir.1982); *see Berrios Rivera v. British Ropes, Ltd.*, 575 F.2d 966, 970 (1st Cir.1978); *Guy v. Mohave County*, 701 F.2d 73, 77 (9th Cir. 1982); *cf. Bishop v. Wood*, 426 U.S. 341, 346–47 & n. 10, 96 S.Ct. 2074, 2078–2079 & n. 10, 48 L.Ed.2d 684 (1976). Application of these principles leads us, with one minor exception, to affirm the district court's judgment.

### I

a. The trustee first argues that the district court's conclusions rest on "hindsight." It points out that Rhode Island law requires a trustee to be "prudent and vigilant and exercise sound judgment," *Rhode Island Hospital Trust Co. v. Copeland*, 39 R.I. 193, 98 A. 273, 279 (1916), but "[n]either prophecy nor prescience is expected." *Stark v. United States Trust Co. of New York*, 445 F.Supp. 670, 678 (S.D.N.Y.1978). It adds that a trustee can indulge a preference for keeping the trust's "inception assets," those placed in trust by the settlor

and commended to the trustee for retention. *See Peckham v. Newton*, 15 R.I. 321, 4 A. 758, 760 (1886); *Rhode Island Hospital Trust Co. v. Copeland, supra.* How then, the trustee asks, can the court have found that it should have sold these property interests in 1950?

The trustee's claim might be persuasive had the district court found that it had acted *imprudently* in 1950, in retaining the buildings. If that were the case, one might note that every 1950 sale involved both a pessimistic seller and an optimistic buyer; and one might ask how the court could expect the trustee to have known then (in 1950) whose prediction would turn out to be correct. The trustee's argument is less plausible, however, where, as here, the district court basically found that in 1950 the trustee had acted not imprudently, but *unfairly*, between income beneficiaries and remaindermen.

■ Suppose, for example, that a trustee of farmland over a number of years overplants the land, thereby increasing short run income, but ruining the soil and making the farm worthless in the long run. The trustee's duty to take corrective action would arise from the fact that he knows (or plainly ought to know) that his present course of action will injure the remaindermen; settled law requires him to act impartially, "with due regard" for the "respective interests" of both the life tenant and the remainderman. *Restatement (Second) of Trusts* § 232 (1959). *See also* A. Scott, *The Law of Trusts* § 183 (1967); G.G. Bogert & G.T. Bogert, *The Law of Trusts and Trustees* § 612 (1980). The district court here found that a sale in 1950 would have represented one way (perhaps the only practical way) to correct this type of favoritism. It held that instead of correcting the problem, the trustee continued to favor the life tenant to the "very real disadvantage" of the remainder interests, in violation of Rhode Island law. *See Industrial Trust Co. v. Parks*, 57 R.I. 363, 190 A. 32, 38 (1937); *Rhode Island Hospital Trust Co. v. Tucker*, 52 R.I. 277, 160 A. 465, 466 (1932).

To be more specific, in the court's view the problem arose out of the trustee's failure to keep up the buildings, to renovate them, to modernize them, or to take other reasonably obvious steps that might have given the remaindermen property roughly capable of continuing to produce a reasonable income. This failure allowed the trustee to make larger income payments during the life of the trust; but the size of those payments reflected the trustee's acquiescence in the gradual deterioration of the property. In a sense, the payments ate away the trust's capital.

The trustee correctly points out that it did take certain steps to keep up the buildings; and events beyond its control made it difficult to do more. In the 1920's, the trustee, with court approval, entered into very longterm leases on the Alice and Wheaton-Anthony buildings. The lessees and the subtenants were supposed to keep the buildings in good repair; some improvements were made. Moreover, the depression made it difficult during the 1930's to find tenants who would pay a high rent and keep up the buildings. After World War II the neighborhood enjoyed a brief renaissance; but, then, with the 1950's flight to the suburbs, it simply deteriorated.

■ Even if we accept these trustee claims, however, the record provides adequate support for the district court's conclusions. There is considerable evidence indicating that, at least by 1950, the trustee should have been aware of the way in which the buildings' high rents, the upkeep problem, the changing neighborhood, the buildings' age, the failure to modernize, all together were consuming the buildings' value. There is evidence that the trustee did not come to grips with the problem. Indeed, the trustee did not appraise the properties periodically, and it did not keep proper records. It made no formal or informal accounting in 55 years. There is no indication in the record that the trust's officers focused upon the problem or consulted real estate experts about it or made any further rehabilitation efforts. Rather, there is evidence that the trustee did little

more than routinely agree to the requests of the trust's income beneficiaries that it manage the trust corpus to produce the largest possible income. The New Jersey courts have pointed out that an impartial trustee must

> view the overall picture as it is presented from all the facts, and not close its eyes to any relevant facts which might result in excessive burden to the one class in preference to the other.

*Pennsylvania Co. v. Gillmore,* 137 N.J.Eq. 51, 43 A.2d 667, 672 (1945). The record supports a conclusion of failure to satisfy that duty.

■ The district court also found that the trustee had at least one practical solution available. It might have sold the property in 1950 and reinvested the proceeds in other assets of roughly equivalent total value that did not create a "partiality" problem. The *Restatement of Trusts* foresees such a solution, for it says that

> the trustee is under a duty to the beneficiary who is ultimately entitled to the principal not to … retain property which is certain or likely to depreciate in value, although the property yields a large income, unless he makes adequate provision for amortizing the depreciation.

*Restatement (Second) of Trusts* § 232, comment b. Rhode Island case law also allows the court considerable discretion, in cases of fiduciary breach, to fashion a remedy, including a remedy based on a hypothetical, earlier sale. In, for example, *Industrial Trust Co. v. Parks,* 190 A. at 42, the court apportioned payments between income and principal "in the same way as they would have been apportioned if [certain] rights had been sold by the trustees immediately after the death of the testator" for a specified hypothetical value, to which the court added hypothetical interest. In the absence of a showing that such a sale and reinvestment would have been impractical or that some equivalent or better curative steps might have been taken, the district court's use of a 1950 sale as a remedial measure of what the trustee

ought to have done is within the scope of its lawful powers.

In reaching this conclusion, we have taken account of the trustee's argument that the buildings' values were especially high in 1950 (though not as high as in the late 1920's). As the trustee argues, this fact would make 1950 an unreasonable remedial choice, other things being equal. But the record indicates that other things were not equal. For one thing, the district court chose 1950, not because of then-existing property values, but because that date marks a reasonable outer bound of the time the trustee could plead ignorance of the serious fairness problem. And, this conclusion, as we have noted, has adequate record support. For another thing, the district court could properly understand plaintiffs' expert witness as stating that the suburban flight that led to mid-1950's downtown decline began before 1950; its causes (increased household income; more cars; more mobility) were apparent before 1950. Thus, the court might reasonably have felt that a brief (1948–52) downtown "renaissance" should not have appeared (to the expert eye) to have been permanent or longlasting; it did not relieve the trustee of its obligation to do something about the fairness problem, nor did it make simple "building retention" a plausible cure. Finally, another expert testified that the trustee should have asked for power to sell the property "sometime between 1947 and 1952" when institutional investors generally began to diversify portfolios. For these reasons, reading the record, as we must, simply to see if it contains adequate support for the district court's conclusion as to remedy (as to which its powers are broad), we find that its choice of 1950 as a remedial base year is lawful.

Contrary to the trustee's contention, the case law it cites does not give it an absolute right under Rhode Island law to keep the trust's "inception assets" in disregard of the likely effect of retention on classes of trust beneficiaries. *Cf. Peckham v. Newton, supra* (original holdings should be retained but only so long as there is no doubt as to their safety); *Rhode Island*

*Hospital Trust Co. v. Copeland, supra* (court not sufficiently informed on safety of holding to order sale or retention). The district court's conclusion that the trustee should have sold the assets if necessary to prevent the trust corpus from being consumed by the income beneficiaries is reasonable and therefore lawful. *Cf. Industrial Trust Co. v. Parks, supra* (wasting assets); *Rhode Island Hospital Trust v. Tucker, supra* (similar).

b. The trustee attacks the lawfulness of the district court's conclusion that it should have sold the Alice Building in 1950 on the ground that principles of res judicata require a finding that retention was lawful. In 1953, the Rhode Island Superior Court approved an application by the trust's beneficiaries to use trust assets to acquire an additional $\frac{1}{32}$ interest in the Alice Building. A guardian *ad litem* represented the present plaintiffs (then minors) at that proceeding. The trustee states that explicit court approval of the *additional* acquisition in 1953 constituted implicit approval of its retaining its existing $\frac{1}{4}$ interest. And, the plaintiffs cannot now attack that decision.

■ To evaluate the trustee's argument, we must consider separately the two different aspects of "res judicata"—claim preclusion and collateral estoppel (or "issue preclusion"). "Claim preclusion" bars the relitigation of any issue that was, or *might have been,* raised in respect to the subject matter of the prior litigation. *Carillo v. Moran,* 463 A.2d 178, 182 (R.I.1983); *Estate of Bassett v. Stone,* 458 A.2d 1078, 1080 (R.I.1983); *Rosa v. Oliveira,* 424 A.2d 644, 645 (R.I.1981). "The claim extinguished includes all rights ... to remedies ... with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Restatement (Second) of Judgments* § 24 (1982). The district court applied this principle in the current litigation, for it prohibited the plaintiffs from attacking the propriety of the trustee's retaining the additional $\frac{1}{32}$ interest in the Alice Building.

This 1/32 interest constituted the entire subject matter of the 1953 superior court decision.

■ The trustee's argument here rests upon the other aspect of res judicata, namely, "collateral estoppel." That principal bars relitigation of any factual or legal issue that was *actually* decided in previous litigation "between the parties, whether on the same or a different claim." *Restatement (Second) of Judgments* § 27 (1982); *Mastracchio v. Ricci,* 498 F.2d 1257, 1260 (1st Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 828, 42 L.Ed.2d 838 (1974), *quoting Cardillo v. Zyla,* 486 F.2d 473, 475 (1st Cir.1973). An issue may be "actually" decided even if it is not *explicitly* decided, for it may have constituted, logically or practically, a necessary component of the decision reached. With this in mind, the trustee claims that the 1953 court could not have reached its conclusion that the additional 1/32 purchase was reasonable unless it also believed that retention of the 1/4 interest was reasonable.

■ The district court rejected this argument for sufficient reason. As a matter of pure logic, the two questions—additional purchase and retention—are not *necessarily* intertwined. It might at once be unreasonable to keep a 1/4 undivided interest in, say, a piece of land, but, at the same time, if one has ruled out the possibility of sale, it might then be wise to buy more. More important, as a practical matter, the two questions were, in the context of this litigation, quite separate. The particular question put to the 1953 court concerned the *prudence* of an additional purchase. The question of retention at issue here, however, does not concern the prudence of retention so much as it concerns the *fairness* of retention as between income recipients and remaindermen. This latter question was never presented to the court in 1953; there is no reason to believe the court would, or should, have considered the fairness issue as part of the question it decided. It would strain the meaning of "actually decided" to find that the 1953 court actually decided the issue. We therefore find no basis for overturning the district court.

c. The trustee challenges the district court's calculation of the surcharge. The court assumed, for purposes of making the trust principal whole, that the trustee had hypothetically sold the trust's interests in the Wheaton-Anthony and the Alice buildings in 1950, at their 1950 values (about $70,000 and $220,000, respectively). It subtracted, from that sum of about $290,000, the $130,000 the trust actually received when the buildings were in fact sold (about $40,000 for the Wheaton-Anthony interest in 1970 and about $90,000 for the Alice interest in 1979). The court considered the difference of $160,000 to be a loss in the value of the principal, suffered as a result of the trustee's failure to prevent the principal from eroding. The court then assumed that, had the trustee sold the buildings in 1950 and reinvested the proceeds, the trustee would have been able to preserve the real value of the principal. It therefore multiplied the $160,000 by 3.6 percent, the average annual increase in the consumer price index from 1950 to 1982, and multiplied again by 32, the number of full years since 1950. Finally, the court multiplied again by an annual 0.4 percent, designed to reflect an "allowance for appreciation." It added the result ($160,000 × 4 percent × 32), about $205,000, to the $160,000 loss and surcharged the trustee $365,000. We are aware of a number of mathematical problems with this calculation. (Why, for example, was no account taken of inflation when subtracting sale receipts from 1950 values?) But, in the context of this specific litigation, fairness as between the parties requires us to restrict our examination to the two particular challenges that the trustee raises.

First, the trustee claims that the court improperly ascertained the 1950 values of the trust's interests because it simply took a proportionate share of the buildings' values. That is to say, it divided the total value of the Alice Building by four to reflect the fact that the trust owned a 1/4 undivided interest. The trustee argues

that the building's values should have been discounted further to reflect the facts that the trust owned a fractional interest in the buildings and that fractional interests (with their consequent problems of divided control) typically sell at a discount.

■ This particular matter in this case, however, was the subject of conflicting evidence. On the one hand, the trustee showed that the marketplace ordinarily discounted the value of fractional interests. On the other hand, the plaintiffs introduced an expert study giving the 1950 values of the trust's interests at precisely the figure shown by the district court. When the trustee finally sold the trust's interests (in 1970 and 1979), their value was *not* significantly discounted. And, since the trustee also controlled (as a trustee) other fractional interests in the same building, the trustee arguably could have arranged to sell the entire building in 1950 as it did in 1970 and 1979. Evaluating this evidence and the merits of these arguments is a matter for the district court. We see no abuse of the district court's powers to make reasonable judgments as to hypothetical values in its efforts to devise an appropriate remedy for the trustee's breach of duty.

■ Second, the trustee argues that the district court should not have applied to the 1950 hypothetical sales value a 4 percent interest factor—a factor designed to compensate for 3.6 percent average annual inflation and for 0.4 percent "appreciation." We do not agree with the trustee in respect to the 3.6 percent.

Rhode Island law simply requires that the court's approach be reasonable and its calculations grounded in the record's facts. *See generally Industrial Trust Co. v. Parks, supra.* The trustee does not claim that it requires the court to follow any one particular calculation method, such as that, for example, contained in *Restatement (Second) of Trusts* § 241. And, we believe the inflation adjustment meets Rhode Island's broader requirements.

■ For one thing, it seems reasonable for the court—in devising a remedy for the

trustee's violation of its duty of impartiality—to assume that a fair trustee would have maintained the property's *real* value from 1950 through 1982. *Cf. In re Trusteeship under Agreement with Mayo,* 105 N.W.2d 900 (Minn.1960) (ordering modification in trust terms where inflation was reducing real value of trust). Such an assumption is consistent with basic trust law policies of providing income to income beneficiaries while preserving principal for the remaindermen, and, consequently, of avoiding investment in wasting assets, *see Industrial Trust Co. v. Parks, supra; Rhode Island Hospital Trust Co. v. Tucker, supra.* Moreover, it is consistent with readily ascertainable general economic facts that wages and many asset values as well as prices have on average kept pace with inflation. *See generally* K. Hirsch, *Inflation and the Law of Trusts,* 18 Real Prop., Prob. & Tr. J. 601 (Win.1983); Comment, *Investment and Management of Trust Funds in an Inflationary Economy,* 126 U. of Pa.L.R. 1171, 1197 (1978). While the value of long term bonds has fallen, the value of common stocks and much property has risen. *See generally* R. Ibbotson & R. Sinquefield, *Stocks, Bonds, Bills and Inflation: The Past and the Future* (1982); J. Wiedemer, *Real Estate Investment* (1979). Where a court is trying to create, not a measure of the trustee's duty, but simply a plausible reconstruction of what would have occurred to a hypothetical 1950 reinvestment, we see nothing unreasonable in assuming that the value of the corpus would have kept pace with inflation.

■ We reach a different conclusion, however, in respect to the additional 0.4 percent, designed to reflect "appreciation." Neither the court nor the parties have provided us with any reason to believe that the trustee would have outperformed inflation. There is no evidence in the record suggesting that a hypothetical reinvestment of hypothetical proceeds from a hypothetical 1950 property sale would have yielded real appreciation over and above inflation's nominal increase. We have found no information about the performance of an aver-

age, or typical, trust. And the general publicly available sources offer insufficient support for a claim of likely real increase. *See* R. Ibbotson & R. Sinquefield, *supra.* Moreover, one can imagine reasonable disagreement about whether any such hypothetical real appreciation would belong to the life tenant or to the remainderman. These factors lead us to conclude that, in adding 0.4 percent interest for real appreciation, the district court exceeded its broad remedial powers. Our recalculation, omitting the 0.4 percent, reduces the surcharge from $365,781.67 to $345,246.56.

d. The trustee objects to the court's having removed it as trustee. The removal of a trustee, however, is primarily a matter for the district court. A trustee can be removed even if "the charges of his misconduct" are "not made out." *Petition of Slatter*, 108 R.I. 326, 275 A.2d 272, 276 (1971). The issue here is whether "ill feeling" might interfere with the administration of the trust. The district court concluded that the course of the litigation in this case itself demonstrated such ill feeling. Nothing in the record shows that the court abused its powers in reaching that conclusion.

## II

a. The plaintiffs argue, on their cross appeal, that the district court should have awarded them prejudgment interest on the surcharge, under R.I.Gen. Laws § 9–21–10 (1969), which states that

[i]n any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added ... to the amount of damages, interest at the rate of twelve per cent (12%) per annum thereon from the date that the cause of action accrued ....

As the plaintiffs note, however, the purpose of this statute is "to compensate plaintiffs for waiting for the recompense to which they were legally entitled." *Lombardi v. Merchants Mutual Insurance Co.*, 429 A.2d 1290, 1293 (R.I.1981), *citing Factory Mutual Liability Ins. Co. of America v. Cooper*, 106 R.I. 632, 262 A.2d 370, 373 (1970). That purpose would not be served by applying the statute here, for the district court calculated the surcharge in a way that made plaintiffs whole. The value of the corpus is maintained at its real 1950 level; that is the amount that the plaintiffs would (hypothetically) have received had the trustees fulfilled their obligations. Plaintiffs have lost nothing "for waiting for the recompense," as they can in no event receive the trust's corpus prior to 1991. Moreover, the Rhode Island courts have made clear that, despite the statute's language, it does not apply literally to "*any* civil action." R.I.Gen.Laws 9–21–10 (emphasis added). In fact, Rhode Island's Chief Justice has written that its Supreme Court "construe[s] the statute to apply only to those actions sounding in tort or contract. *See Gott v. Norberg*, R.I., 417 A.2d 1352 (1980)". *Andrade v. State*, 448 A.2d 1293, 1297 n. 5 (R.I.1982) (Bevilacqua, C.J., dissenting on other grounds). The action in this case is traditionally viewed as one in equity, not in tort or contract. Only by construing the statutory word "damages" broadly can a "surcharge" be brought within its scope. Since neither the purpose nor the language of the Rhode Island statute requires its application here, the district court was correct in not applying it.

b. Plaintiffs also argue that the district court should have awarded them attorneys' fees to be paid by the trustee from its own pocket. The plaintiffs concede that in an action of this sort, the award of attorneys' fees at the expense of the trustees (not the trust) is an "exercise of [the court's] discretion." *Horowitz v. Le Lacheure*, 81 R.I. 235, 101 A.2d 483, 488 (1953). Plaintiffs also state that the court, when deciding whether to award fees, should take account of the litigation's outcome, the need to bring suit to correct the trustee's errors, and the trustee's conduct. The district court here found that plaintiffs succeeded in winning only a small part of the money that they claimed the trustee owed them. In its view, had the plaintiffs' claims been less extravagant, eight years

of litigation might not have been necessary to obtain the surcharge that they won. The court also characterized the trustee's failing as a simple breach of fiduciary duty not reflecting willfully wrong or egregious conduct. It stated that there was "absolutely no evidence of malice or bad faith on the part of the Trustee." In addition, the court found evidence that plaintiffs' attorneys sought "inflated or unnecessary unsubstantiated charges." Under these circumstances, we believe the court did not abuse its powers in refusing to depart from the ordinary American rule requiring each party to pay its own attorneys' fees. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

*The judgment of the district court is modified and as modified affirmed.*