Robert B. DENNIS, et al.

v.

RHODE ISLAND HOSPITAL TRUST NATIONAL BANK.

Civ. A. No. 74–44.

United States District Court, D. Rhode Island.

May 20, 1983.

Supplemental Opinion July 25, 1983.

 

Gerard A. Dupuis, Ober, Grimes & Shriver, New York City, and Paul P. Baillargeon, Woonsocket, R.I., for plaintiffs.

Edward J. Regan, Edwin H. Hastings, Peter J. McGinn, Tillinghast, Collins & Graham, Providence, R.I., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Plaintiffs, Robert B. Dennis and William A. Dennis, III, current income beneficiaries and remaindermen if they survive to October 29, 1991, brought this action for an accounting and to surcharge Defendant as

Trustee of the Trust under the will of Alice M. Sullivan, deceased. Additionally, claims have been pursued on behalf of the Estate of Alice M. (Sullivan) Dennis, deceased, and Theresa Dennis.

Alice M. Sullivan deceased on September 28, 1909, survived by her husband and four children, Robert J.B., Edmond, William B. and James B. By her will dated January 28, 1905, the decedent devised her real estate to her husband for life, and thereafter, in trust for the benefit of her issue until 21 years after the decease of all her children. Defendant, hereinafter referred to as Trustee, was nominated as sole Trustee.

Decedent's personal estate was placed in trust and ultimately distributed to her children as each attained the age of 25.

Decedent's husband deceased on October 8, 1920. The last survivor of decedent's children deceased on October 29, 1970, and the Trust will terminate on October 29, 1991.

Decedent was the daughter of Joseph Banigan. Although not perfectly clear from the evidence, it appears that Joseph Banigan was the owner of a number of commercial buildings located in downtown Providence. Decedent's real estate interests appear to be a portion of her father's real estate which was apparently divided among his children in shares.

At the time of her death decedent owned a one-eighth (⅛) interest in the Wheaton-Anthony Building, a one-fourth (¼) interest in the Jones Building and a one-fourth (¼) interest in the Alice Building and four (4) undivided one-fourth (¼) interests in residential real estate. The Wheaton-Anthony, Jones and Alice buildings were multi-story commercial buildings located in the commercial districts of the City of Providence. Decedent's husband, who had a power of sale, retained all of the assets of her estate during his lifetime.

The Trustee sold the undivided interest in residential real estate in 1921, and invested the proceeds in accord with the provisions of the will.

In 1936, a parcel of residential property was added to the Trust by Opinion of the Supreme Court of the State of Rhode Island. *Sullivan v. R.I. Hospital Trust Co.,* 56 R.I. 253, 262, 185 A. 148, 152 (1936). This parcel was sold by the Trustee in 1942 and the proceeds reinvested.

In 1945, the Jones Building was sold in a sale joined in by the Trustee for a total purchase price of $175,000.

In 1953, with the approval of the Superior Court, State of Rhode Island, an additional ½₂d interest in the Alice Building was acquired by the Trust for a purchase price of $30,000, bringing the Trust's interest to %₂d. This purchase was made with the consent of the court acting upon the recommendation of the then income beneficiaries, and the participation of a guardian ad litem appointed to represent the interests of Plaintiffs in this action who were then minors. The decree entered March 17, 1953 provides that it is binding on all persons designated and described in the bill of complaint, including all persons not ascertained or not in being.

In 1970, the Wheaton-Anthony Building was sold in settlement of a partition proceeding for a total purchase price of $325,000. Deeds were delivered from 26 owners, including the Trustee.

The Alice Building was sold in 1979 for a total purchase price of $386,000.

The decedent's will, as it related to disposition of real estate provides:

To my beloved husband, James E. Sullivan for his own use and benefit, I bequeath and devise all the real estate of which I may be seized at the time of my decease for and during the term of his natural life; and from and after his decease to the Rhode Island Hospital Trust Company as in trust as follows:—to pay over the net income of said real estate to my children then living, in equal shares, and to the issue of any deceased child the share of such child, and, in the event of the decease of any of my said children leaving no issue, then to pay the share of said deceased to my surviving child, or children, and, upon the the death of all of

my said children to hold said real estate for a period of twenty-one years from the decease of the last surviving child, when the said real estate is to be divided between the heirs of my children, said heirs taking by right of representation and not *per Capita*. . . .

. . . In the event of the death of all my children leaving no issue and after the death of my husband, James E. Sullivan, I devise said real estate to the heirs of my late father, Joseph Banigan.

The evidence of the rental history of the Jones Building is vague. The decedent's one-eighth (⅛) interest was retained in trust 25 years from 1920 to 1945.

The Trustee entered into a lease dated September 1, 1924 of the Wheaton-Anthony Building to Exchange Realty Co. for a term of ninety-nine (99) years to August 31, 2023. This lease was approved by the Superior Court of the State of Rhode Island in an action entitled *R.I. Hospital Trust Co. v. R.J.B. Sullivan*, Eq. 6913, August 29, 1924.

The first year annual net rental under the lease was $30,000, the following four years annual net rental was $32,000; the following five years net annual rental was $35,000, and, the net annual rental for the period from September 1, 1954 to August 31, 2023, was not less than $37,500, subject to increase in accord with the formula stated in the lease agreement. The rental was reduced by agreements in 1933, 1936, and 1941, and adjusted by agreements in 1938 and 1947. The rental was set by arbiters for the period 1951 to October, 1971, yielding at all times from 1951 to 1971 less than the minimum annual rental of $37,500 required by the lease.

With the consent of the Trustee, the lease was assigned to Club Realty Co. as lessee on April 29, 1965. The assignees as owners of a fractional undivided interest later brought a partition proceeding and the Trust's interest in Wheaton-Anthony Building was sold in 1970.

So far as can be ascertained from the evidence introduced, the modifications of the lease of September, 1924, were neither submitted to nor given court approval.

On December 30, 1936, the Trustee, in its capacity as a bank loaned $58,900 to Exchange Realty Co. evidenced by a promissory note secured by a second mortgage of Exchange Realty Co.'s interest in its lease of the Wheaton-Anthony Building.

From 1920 to 1927, the Alice Building was leased to a number of tenants. In 1927, the Trustee together with all of the other owners entered into a lease of the Alice Building to Alice Building, Incorporated, for a period of forty (40) years beginning November 1, 1934, and granted two options to renew for successive twenty (20) year periods. This lease was approved by the Superior Court of the State of Rhode Island in an action entitled *R.I. Hospital Trust Co.*, Eq. No. 8688, November 22, 1927. The Trustee, in its capacity as a bank was designated as agent for all of the owners.

The annual rental was $75,000 for the first ten (10) year period, $77,500 for the second ten (10) year period, and, for the remaining twenty (20) years the rent was to be fixed by agreement or arbitration.

The rentals were adjusted by nine separate agreements during the period of November 1, 1934 to July 1, 1960, as follows:

| | |
|---|---|
| Nov. 1, 1934—Oct. 31, 1935 | $55,000 |
| Nov. 1, 1935—Oct. 31, 1936 | 65,000 |
| Nov. 1, 1936—Oct. 31, 1942 | 70,000 |
| Nov. 1, 1942—Oct. 31, 1944 | 72,500 |
| Nov. 1, 1944—Oct. 31, 1949 | 75,000 |
| Nov. 1, 1949—Oct. 31, 1954 | 77,500 |
| Nov. 1, 1954—Dec. 31, 1957 | 75,000 |
| Jan. 1, 1958—June 30, 1960 | 69,000 |
| July 1, 1960— | 59,000 |

So far as can be determined from the evidence introduced, the modifications of the 1927 lease were neither submitted to nor given court approval.

The Alice Building was sold in 1979.

Alice Building, Inc. deposited $100,000 in cash or securities with the Trustee, in its capacity as a bank for certain alterations and as security for the performance of the covenants of the lease. The Trustee asserts that "none of the funds remain(s) in hand" but there is no explanation of the application of the fund.

Alice Building, Inc. became insolvent in 1970. The Trustee, in its capacity as a bank became trustee of the Alice Building Trust created to operate and manage the Alice Building on behalf of all of its owners on March 17, 1970. This arrangement was prompted by a desire on the part of the bank to prevent the tenants of Alice Building from also terminating their leases if the lease from the owners to Alice Building, Inc. was terminated. The bank collected a commission, based on rentals, and after deducting expenses and depreciation paid the net rent to the owners, including itself as Trustee.

The bank, from time to time, acted as a Trustee of other trusts owning interests in the Jones Building or the Wheaton-Anthony Building or the Alice Building, including Trusts under the wills of Mary A. McElroy, Robert B.B. McElroy, Leo H. Levy, Ruby H. McElroy, Henry A. Tillinghast, James Tillinghast, Charlotte L. Tillinghast, William R. Tillinghast, Foster Townsend, and Charles F. Tillinghast. The details are sparse but it appears that the bank acted as trustee of a 50% interest in the Alice Building, as trustee of both the Alice M. Sullivan trust and the Mary A. McElroy trust from 1927 to 1933, and as trustee of the Alice M. Sullivan trust and the Robert B.B. McElroy and Leo H. Levy trusts in 1939. In 1974, the bank acted as Trustee of a 31.2% interest including the ⁹⁄₃₂d interest of the trust under the will of Alice M. Sullivan.

Decedent's husband was authorized to sell, during his lifetime, any part of the decedent's real estate and to invest the proceeds, holding the proceeds "as part of real estate." None of the decedent's real estate was sold by her husband during his lifetime.

The Trustee was authorized to sell real estate. The will provides:

I authorize and empower the said Rhode Island Hospital Trust Company to sell and convey any and all of said real estate which it may be come (sic) possessed of, under this will, and to hold the proceeds of any such sale or sales as it would have held the real estate sold, and to distribute said proceeds at the time when the distribution of said real estate should be made in the same manner as said real estate so sold would then be distributed if it had not been sold.

I authorize and empower the said Rhode Island Hospital Trust Company to invest the proceeds of any sale or sales of real estate made under the power herein contained in first mortgages of improved real estate, in bonds of any city or town in New England, in first mortgage bonds of any railroad, and in any other way approved by the Probate Court of Providence County in said Rhode Island, and also to deposit said proceeds for investment in any Savings Bank in said Providence paying not less than three per centum per annum.

The Trustee has filed a First Account for the period October 8, 1920 to December 31, 1977, and three supplemental accounts for the period January 1, 1978 to May 12, 1978, May 13, 1978 to December 31, 1978 and January 1, 1979 to December 31, 1982. Other than the accounts filed in this action as a result of the demands of Plaintiffs, the Trustee has not accounted either formally or informally during the more than sixty (60) years of the existence of the Trust.

From time to time appraisals of the fair market values of the properties were obtained. It was necessary to obtain these appraisals due to then existing circumstances, such as a pending or proposed sale of an interest. The Trustee did not from time to time obtain appraisals of the properties as an aid in the administration of the Trust or to determine the impact of market conditions upon the value of the remainder interests.

The opening values reported for purposes of the account of the real estate were based upon 1920 tax assessed values determined by the City of Providence. The Trustee has indicated little disagreement with the values of the real estate during the term of the Trust determined by Plaintiffs' real estate expert Peter A. Laudati, Jr. Mr. Laudati's 1920 values are less than the 1920 tax assessed values.

The accounts, which span a period of fifty-eight years report an opening value of the three commercial properties, as follows:

| | Tax Assessed (1920) | Laudati |
|---|---|---|
| Jones Building | $226,440.00 | $220,000.00 |
| Wheaton-Anthony Building | 522,320.00 | 449,000.00 |
| Alice Building | 884,040.00 | 760,000.00 |

The accounts are summarized in Appendix A to this Opinion.

Considering the fractional interest owned by the Trust, the Trust's interests as of October 8, 1920, were valued:

| | Tax Assessed Value (1920) | Laudati |
|---|---|---|
| Jones Building (¼) | $56,610.00 | $55,000.00 |
| Wheaton-Anthony (⅛) | 65,290.00 | 56,125.00 |
| Alice Building (¼) | 221,010.00 | 190,000.00 |
| | 342,910.00 | 301,125.00 |

The remaining initial assets of the Trust were four (4) one-fourth (¼) undivided interests in residential real estate. The Trust's one-fourth (¼) interests were valued at $7,160.00. The real estate added to the Trust in 1936 was valued in the 1936 Tax Valuation of the City of Providence at $36,380.00. This property was sold in 1942, at a loss of $26,416.00 ($36,390.00 less $9,974.00).

The Jones Building was sold in 1945 at a loss of $13,020.90, ($56,610.00 less $43,589.10), the Wheaton-Anthony Building was sold in 1970 at a loss of $25,577.53, ($65,290.00 less $39,712.47). The additional undivided ¹⁄₃₂d interest in the Alice Building, acquired in 1953 cost $30,000. The Alice Building ⁹⁄₃₂d interest was sold in 1979 at a loss of $149,496.23 ($251,010.00 less $101,513.77). Based on the 1920 tax values, and the cost of the ¹⁄₃₂d interest in the Alice Building purchased in 1954, without any adjustment for inflation during the last sixty years, the commercial real estate in the Trust was liquidated at a total book loss of $193,094.66.

| | Proceeds | Loss (1920 tax value) |
|---|---|---|
| Jones Building | $43,589.10 | $13,020.90 |
| Wheaton-Anthony Building | 39,712.47 | 25,577.53 |
| Alice Building | 101,513.77 | 154,496.23 * |
| | 184,815.34 | 193,094.66. |

Thus, the Trust which had assets in 1920 valued at $357,230.00 ($308,285.00 according to Plaintiffs' expert), sixty-two years later had a principal balance of $162,700.13. During the sixty-two year period, income distributions totaled $1,092,514.48, an average of $34,141.07 per year. In the latest available calendar year, (1982) the net income disbursed by the Trust was $15,856.08.

The restrictions imposed by the decedent upon the Trustee's authority to invest proceeds of sale of real estate may have been appropriate in the early 1900's. However, as modes of permissible trust investment expanded, the restrictions were clearly inappropriate.

In February of 1972, the Trustee applied to the Superior Court of the State of Rhode Island, alleging that the investment restrictions "severely handicapped" its attempts to effect sound, diversified and timely investment of funds. Therefore, the Trustee claimed it was "unable to adequately perform its fiduciary duties in the best financial interest of the beneficiaries."

The petition also alleged that a permanent broadening of its investment authority would eliminate "the necessity for continual and costly recourse to the Probate Court of the City of Providence for approval of each investment of a type not enumerated in the trust instrument." At or about the time the decedent's will was executed, probate proceedings were conducted in the Municipal Court of the City of Providence. Thereafter, decedent's estates was administered in the Probate Court of the City of Providence. Administration of trusts including investment authority was vested in the Superior Court of the State of Rhode Island. There appears to have been no court known as the "Probate Court of Providence County in said Rhode Island" at anytime from the time of creation of the trust to the present time. The Trustee construed the will to mean the Probate Court of the City of Providence. There is no evidence that the Trustee at anytime applied to that court or

* Apportioned on the basis of the ¼th interest acquired in 1920 ($132,885.52) based upon 1920 tax assessed value and ¹⁄₃₂d acquired in 1954 ($16,610.69) based on $30,000.00 purchase price.

any other court, except the 1972 application to the Superior Court of the State of Rhode Island concerning investment authority. The 1972 application was made under the authority of R.I.Gen.Laws § 18–4–2, a statute which has been in effect since January 31, 1896. *See Branch v. DeWolf,* 28 R.I. 542, 544, 68 A. 543, 544 (1908).

Such of the history of the administration of the Trust as is now available presents a view of a trust spawned in difficult circumstances, because its principal assets were ownership of fractional interests in commercial properties built before 1900 and the Trust extends into the last decade of the twentieth century. There is strong proof that the Trustee was influenced by the desires of the income beneficiaries to maintain the best possible income. There is no evidence, except with respect to the Alice Building in the late 1940's and the 1970's, of any effort to provide for the physical and functional obsolescence of the trust properties. The evidence also strongly suggests that with respect to the Wheaton-Anthony and Alice Buildings, the Trustee's efforts to avoid the multiple responsibilities of ownership resulted in long term leases of 99 and 40 years, with two twenty year options respectively, to entities which in turn sublet to the actual tenants of the properties. The Trustee leased the properties to corporations for a fixed rental which was thereafter negotiated downward during the term of the lease. Leasehold maintenance and improvement became the responsibility of the subtenants. The lessees merely managed the properties and, so far as the evidence shows, had only one asset, the lease. Based upon the incomplete financial information in evidence about half of the gross rentals were retained by the lessee and about one-half remitted to the Trust beneficiaries. Complicating the whole picture is the fact that the Trustee, as a bank, was competing for commercial tenants in the immediate area of the trust properties.

The Jones Building was located across the street from the Trustee's main office. The Wheaton-Anthony Building was located but a short distance down the street from the Trustee's main office, but in the next block.

The Alice Building is located several blocks away on the same street as the main office of the Trustee. Apart from the information available to the Trustee by reason of its administration of the trust properties, it must have been keenly aware of the economic forces at work in the downtown Providence area during its administration. The administration of the Trust assets was subjected to the major forces of the "bust" of 1929, the "boom" of the post World War II period, and then the flight to the suburbs of the 1950's. In addition, local aberrations, such as the establishment of a major financial district in the area adjacent to the Trustee's main office, and, beginning in the period after World War II, the decline of properties in the commercial area of downtown Providence where the Alice Building was located, affected the administration of the Trust.

Plaintiffs' real estate expert, Peter Laudati, expressed his opinion concerning the market value of the commercial properties for the period 1920 to 1979, when the Alice Building was sold. The Trustee does not dispute the substantial accuracy of the values. The Court is satisfied that those values are accurate, as far as they can presently be determined. This evidence establishes that the value of all three properties reached their highest point in 1928–29 and that their second highest point was in 1949. This evidence also established that all three properties were sold at or near their lowest point, the Jones Building in 1945, the Wheaton-Anthony Building in 1970, and the Alice Building in 1979, for prices that approximate the values established by Plaintiffs' expert. The Jones Building was sold under threat of its principal tenant vacating, the Wheaton-Anthony Building was sold under threat of a partition proceeding, and the Alice Building was sold following the insolvency of its lessee and the assumption of management responsibilities by the Trustee in its capacity as a bank.

There is no testimony that the Trustee at any time made a determined effort to sell the Trust's interest in the properties except to avoid approaching disaster. There is no

evidence, in the years prior to 1960, that the Trustee at any time seriously reviewed the financial circumstances of the properties from the point of view of exercising its authority to sell the Trust's interest. There is evidence that from time to time the Trustee suggested a sale to the then income beneficiaries and, when the income beneficiaries objected, or observed that they would agree to a sale if the proceeds would generate the same income for them, the Trustee took no further action.

There is evidence that the Trustee was less than vigilant in enforcing the provisions of leases that required repair and maintenance of the properties. While such evidence as is available indicates an expenditure of $86,000 in 1948 and 1949, principally for new elevators and electrical work in the Alice Building and payments to a capital account required by the lease of the Wheaton-Anthony Building, there is no evidence that after 1920, there were any extensive or ongoing efforts to modernize or rehabilitate the properties. There is evidence, already noted, that the Trustee participated in agreements to reduce rental income. Such records as have been introduced do not suggest that at any time the Trustee sought to terminate either of the long term leases involved. The evidence establishes beyond doubt that the reductions in rent were submitted to the then income beneficiaries, before the Trustee agreed, and were not concluded without the consent of the income beneficiaries.

The evidence is that both the Wheaton-Anthony Building and the Alice Building were obsolete at the time of their respective sales, in terms of the then existing market for rentable commercial or office space.

Such evidence as exists in the later years of the Trust clearly suggests that no one officer of the Trustee was really responsible, or at least knew that they were responsible to make a judgment concerning sales of the properties.

There is virtually no evidence of any policy deliberations concerning the retention of the properties prior to 1950. In the absence of such evidence, it must be concluded that the subject was not considered.

Undoubtedly, the fact that the Trust owned only undivided interest rather than a fee interest presented real difficulties with respect to a sale of those interests. However, the very history of the Trust establishes that undivided interests were bought and sold by others, and indeed one interest (1/32 in the Alice Building), was purchased by the Trust itself in 1953. And, it is beyond dispute, that ultimately the properties were sold.

Partition was not considered by the Trustee at any time, although the Wheaton-Anthony Building was sold under a threat of partition by the purchasers of an undivided interest who had previously acquired an assignment of the lease with the consent of the Trustee and the then income beneficiaries.

■ The Trustee quite properly contends that the unerring view of hindsight is not to be applied to determine the propriety of its administration of the Trust. In general, the duty of a testamentary trustee concerning its investment of the trust assets is governed by the "prudent man rule." *Rhode Island Hospital Trust Co. v. Copeland,* 39 R.I. 193, 215, 98 A. 273, 279 (1916); *Peckham v. Newton,* 15 R.I. 321, 322, 4 A. 758, 760 (1886); *Carpenter v. Carpenter,* 12 R.I. 544, 549 (1880). The duty is succinctly stated in *Rhode Island Hospital Trust Co. v. Copeland,* 39 R.I. at 215, 98 A. 273:

> "Trustees must be prudent and vigilant and exercise a sound judgment. They are to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as probable safety of the capital to be invested."

The propriety of an investment is thus to be viewed from the point of view of the prudent man considering the circumstances at the time the investment is made or continued, unaided by the actual facts of subsequent history.

■ The Trust was to continue for a period consistent with Rhode Island's rule against perpetuities, lives in being plus twenty-one years. The decedent's children were life tenants, and were to receive only income. Decedent's grandchildren or more remote issue would be income beneficiaries, at least, during the lifetime of the survivor of decedent's children and the twenty-one year period in gross thereafter. None of the corpus was to be distributed to decedent's children. Thus, upon acceptance of the Trust in 1920, the Trustee was aware of the fact that it was to administer the Trust for the benefit of life tenants and remaindermen. The Trustee was therefore under a duty to administer the Trust for the benefit of all beneficiaries, life tenants and remaindermen. "A trustee, standing as he does between life tenant and remainderman, must not favor one at the expense of the other." *Industrial Trust Co., et al. v. Parks, et al.,* 57 R.I. 363, 376, 190 A. 32, 38 (1937); *Rhode Island Hospital Trust Co. v. Tucker,* 52 R.I. 277, 278, 160 A. 465, 466 (1932). Although both *Industrial Trust Co. v. Parks,* and *Rhode Island Hospital Trust Co. v. Tucker,* involved wasting or unproductive assets, the rule against favoritism applies in all circumstances. Technically, the Trust's undivided interests in commercial real estate may not be wasting or unproductive assets. The long term leases entered into by the Trustee, 90 years and 40 years with two twenty year options of the Wheaton-Anthony Building and the Alice Building respectively, in a real practical sense, considering the almost total abdication of managerial responsibility, the failure to enforce requirements for maintenance and repair, the Trustee's policy of successive agreement to rent reduction, and the Trustee's desire to satisfy the demands of income beneficiaries, could be viewed as converting those interests into wasting assets. Wasting property consists of such interests as terminate or necessarily depreciate in the course of time either because of the nature of the interest or because of the character of the subject matter of the interest. Restatement (Second) of Trusts § 239 comment a (1959). The buildings involved

were all built before 1900 and were therefore at least twenty years old at the time the Trust was accepted. Both at the time of the 1924 lease of the Wheaton-Anthony Building for 99 years to the year 2023 and at the time of the 1927 lease of the Alice Building for a period of forty years (1934 to 1974) with two options for an additional forty year period (1974 to 2014) the Trustee must have been aware that time alone would, in all probability, adversely affect the remaining value of the buildings. Nothing in the evidence suggests that the land value could be expected to appreciate to the point of overcoming building depreciation and obsolescence. It is true that both leases were entered into after court consent was obtained, and, absent other circumstances, the complaint of remaindermen would be barred. *See Smith v. Widmann Hotel Co.,* 74 S.D. 118, 120, 49 N.W.2d 301, 303 (1951) Restatement (Second) of Trust § 189(d) (1959). However, there were other circumstances which cannot be overlooked. The Trustee did not enforce the terms which the court approved. The rental of the Wheaton-Anthony Building was adjusted five times beginning in 1933, and was established by arbitration at less than the minimum rental for the entire period 1951 to 1971, without court approval. In the period November 1, 1934 to July 1, 1960, the rental of the Alice Building was adjusted by nine separate agreements beginning in 1934, without court approval. A trustee may not modify a court authorized lease without court approval. *See City Bank Farmers Trust Co. v. Smith,* 263 N.Y. 292, 293, 189 N.E. 222, 224 (1934); *see also* Annot., 67 A.L.R.2d 978, 989 (1959); Annot., 93 A.L.R. 603 (1934).

Given the circumstance of long term leases, prudent concern for remainder interest suggests some provision by way of a depreciation reserve. Restatement (Second) of Trusts § 239(a) (1959).

■ Buildings may be wasting assets. Restatement (Second) of Trusts § 239(h) (1959), in part, states:

If the trust estate includes a building used for business purposes—the trustee is

ordinarily under a duty to set aside a part of the income as a reserve for depreciation in accordance with the ordinary business customs with respect to depreciation and obsolescence.

The decedent's will could be construed to suggest that a depreciation reserve is not required. The will provides for the payment of net income to the income beneficiaries and defines net income to be:

> ... the balance of the income received from said real estate after the payment of all taxes lawfully assessed thereon and all necessary expenses incurred in managing said real estate and in keeping said real estate insured and in tenantable condition ...

Because the duty to maintain and repair the properties was shifted by the lesses to the subtenants, there is little evidence of the efforts or amounts expended to keep the properties in tenantable condition. It is only possible to gauge the Trustee's performance of this obligation by what happened to the properties and those instances of complaint by tenants of the lessee. Indeed there is some evidence to suggest that the properties were not maintained. The accounts do not demonstrate that, except in one instance, any substantial amount was ever expended by the Trustee to maintain tenantable conditions. There were complaints and opinions that the properties had become "obsolete" and unable to compete with more modern buildings for tenants.

█ Whether or not the Trust assets, consisting of undivided interest in multi-floor commercial buildings are considered as wasting assets, the matter of their sale must have occurred to someone in authority during the term of this Trust. There is no evidence of any considered study of this subject by the Trustee, at least, none has been produced. The Trustee points to the substantial income produced during the term of the Trust. There is the recurrent theme, in communications with beneficiaries, that similar income could not be produced in any other investment. Also, there is the persistent concern of the Trustee for the wishes of the then income beneficiaries.

There is a total lack of evidence that the Trustee ever seriously considered the plight of the remainder interests. Positive evidence indicates that the Trustee continually yielded to the demands of the income beneficiaries, and did not deign to act contrary to their wishes, in spite of the fact that it was the duty of the Trustee alone to manage the Trust. Indeed, the duty of the Trustee was to treat both income beneficiaries and remaindermen fairly, and, it was required to exercise its authority on the basis of an exercise of its own judgment. Put simply, the Trustee did not consider an exercise of its power to sell.

It is suggested that there was no market for undivided interest in commercial real estate located in downtown Providence. The very fact of the sale of trust properties belies this contention. Except for their existence, there is no evidence that the Trustee's other responsibilities, as trustee of other trusts which also owned undivided interests in the same properties affected its inaction. Nor is there a scintilla of evidence that the Trustee's ownership of a bank building competing in the same market had any effect upon its inaction. These factors suggest, however, that a decision to sell could be a difficult decision for the Trustee to make, with the possibility of becoming involved in a kind of internecine war should the Trustee of this Trust sell its interest. The inertia which infected the entire period of administration could simply have resulted from a conclusion that there were too many collateral problems involved. All of the foregoing is speculation, but what is fact is the very real disadvantage to the remainder interest which must have been known to, and appreciated by, the Trustee throughout the sixty year administration of the Trust. It is fact that the Trustee consciously preferred the interests of life tenants to the disadvantage of the remainder interests. The real issue is not whether the prudent man would have sold, but when the prudent man would have sold.

In 1950, the Trustee had thirty years of experience with the administration of the Trust. Certainly by that time it was aware,

or should have been aware of the fact that the retention of the real estate interests had the decisive effect of favoring the income interests at the expense of the remainder interest. If nothing else, the fact of the high rate of return to the income beneficiaries should have alerted the Trustee to the preference of the income interests.

The Trustee's proof that the rate of return earned from rentals was as much as twice the rate of return on bonds proves too much. Since little if any of the rental income was used to maintain the value of the capital assets, the income beneficiaries received more than their fair share.

All of the buildings were more than a half century old in 1950, and were in competition with other more modern office buildings. The commercial exodus from downtown Providence was well on its way and the Trustee must have been keenly aware of this phenomenon. So far as can be determined, the Trustee did nothing even to consider the possibility of a sale.

Since the Trustee's interest in the Jones Building was sold before 1950 (1945), and at a value closely approximating the appraised value of Plaintiffs' expert, the Court must find that Defendant Trustee did not breach its duties with respect to that interest.

Both the Wheaton-Anthony and the Alice Buildings interests were sold after 1950 (1970 and 1979 respectively). The Court finds that the Trust's interest in both properties should have been disposed of no later than 1950. The failure of the Trustee to act, in the interest of all beneficiaries, both income and principal, no later than 1950, resulted in a loss to the Trust for which the Trustee must be held responsible.

■ The circumstances are complicated by the fact that the Trustee acquired a $\frac{1}{32}$d interest, by purchase with prior court approval, in the Alice Building in 1953. In the usual course, a trustee may not be surcharged for transactions which are approved judicially. Restatement (Second) of Trusts § 220 (1959). Hence the Trustee may not be surcharged for any loss attributable to that $\frac{1}{32}$d interest. It is to be noted that the proceeding in which the Superior Court of the State of Rhode Island approved the purchase of an additional $\frac{1}{32}$d interest in the Alice Building was essentially a formal proceeding, filed on March 16, 1953, in which a Decree was entered the following day, March 17, 1953. The present Plaintiffs were represented by a guardian ad litem. The Bill of Complaint referred to the ownership by the Trust of a ¼ interest. The thrust of the Bill of Complaint was authority to sell a portion of bonds, then a part of the principal, and an application of the proceeds to the purchase of an undivided $\frac{1}{32}$d interest in the Alice Building. A Vice-President of the Defendant Trustee provided an affidavit in support, which asserted that the purchase was desirable because the income derivable exceeded income from other types of Trust securities usually purchased, and that "the investment will afford to the Trust estate a reasonable possibility of appreciation in value during such time as the interest may be held by the trust." The Decree entered March 17, 1953, authorized the purchase, and was made binding on all beneficiaries, who were or might become beneficiaries, of either income or principal. The application was supported by an appraisal, which is not in evidence, but which must have established a value of not less than $960,000 (32 × 30,000). The Superior Court did not consider the prudence of maintaining the Trust's ¼ interest in the Alice Building, although instructions could have been requested from the court. It certainly cannot now be said that this formal approval of the purchase of a $\frac{1}{32}$d interest had the effect of insulating the Trustee from challenge by Plaintiffs who were then minors, or any other persons who may ultimately possess remainder interests, for inaction with respect to the ¼ interest.

Had the Trustee sold the ⅛ interest in the Wheaton-Anthony Building the Court finds it would have realized $68,877.50, based upon a fair market value of the entire property of $551,020, as determined by Plaintiffs' expert. It would have also realized $221,500 for the sale of its ¼ interest in

the Alice Building based on a fair market value of $886,000. What evidence there is of the market for undivided share at a discount is unimpressive considering evidence to the contrary and the fact that the undivided interests were sold later at or about their proportionate share of the fair market value. Thus, the Trust would have received a total of $290,377.50 in 1950, as principal in exchange for its remaining interest in real estate.

Both parties produced expert economists. The method employed by Plaintiffs' economist to determine loss to the Trust estate is decidedly unhelpful. Plaintiffs' expert assumed the reinvestment of income, thereby producing a compounding effect, which would not occur in a trust which was required to distribute all of its net income. Whatever the income beneficiaries did with income could have no effect on the principal. And, income could not be retained and reinvested by the Trustee. The Defendant's expert was similarly unhelpful in that his testimony merely went to impeachment of Plaintiffs' assumptions.

█ The Court is left to the devise of fashioning a calculation of damages with a view to making aggrieved remaindermen beneficiaries whole. A trustee which fails to sell trust property that is its duty to sell is charged with the amount which would have been received if the property was properly sold, with interest thereon. Restatement (Second) of Trusts § 209(1) (1959).[1]

The Wheaton-Anthony Building was sold in 1970 for $39,712.47. The Alice Building ⁹⁄₃₂d interest was sold in 1979 for $101,513.77. The portion of the proceeds allocable to the Trust's ¼ interest in the Alice Building is $90,234.47. (⅛ = 11,279.30). The 1950 values of the Trust's interest according to Plaintiffs' expert were, Wheaton-Anthony Building $68,877.50 and Alice Building $221,500. The loss which the trust corpus sustained by reason of the failure to sell in 1950 is:

| | | Loss |
|---|---|---|
| Wheaton-Anthony | | |
| 1950 Value | $68,877.50 | |
| Sold 4/6/70 | 39,712.47 | |
| | | $29,165.03 |
| | | Loss |
| Alice Building | | |
| 1950 Value | $221,500.00 | |
| Sold 1979 | 90,234.47 | |
| | | $131,265.53 |
| Total | | $160,430.56 |

The determination of a rate of interest to be applied necessarily requires a consideration of the fact that the income received from the trust investments would not have been paid to remaindermen at the termination of the trust, but was required to be distributed to the income beneficiaries. If a rate of interest were applied which represented earnings on a typical trust investment, the remaindermen would be overcompensated. In reality, the purpose of a calculation of interest in this instance is to compensate the remainder interest for loss of purchasing power of the asset from the time of the loss to the present, and the loss of appreciation which might have occurred with prudent investment. The evidence of changes in the consumer price indices is helpful in that it is some evidence of loss of purchasing power. The average annual increase in the consumer price index from 1950 to 1982 is 3.6% per year. Considering some allowance for appreciation, 4% simple interest is a fair and reasonable rate of interest to be applied. Simple Interest at the rate of 4% per annum to December 31, 1982 on the total amount of the loss is $205,351.11. ($160,430.56 × .04 × 32 years). The total principal and interest is $365,781.67. Defendant is surcharged a total of $365,781.67, to be added to the corpus.

█ The Trustee contends that Plaintiffs are guilty of laches and therefore barred. The burden of proof on the issues of laches lies with the Trustee. Restatement (Second) of Trusts § 219(1) (1959) states:

In determining whether the beneficiary of a trust is precluded by laches from

---

1. Although the illustrations to § 209(1) state that the income earned is to be credited, in this instance the income beneficiaries and the principal beneficiaries are not the same.

holding the trustee liable for breach of trust, the court will consider among others the following factors: (1) the length of time which has elapsed between the commission of the breach of trust and the bringing of suit; (2) whether the beneficiary knew or had reason to know of the breach of trust; (3) whether the beneficiary was under an incapacity; (4) whether the beneficiary's interest was presently enjoyable or enjoyable only in the future; (5) whether the beneficiary had complained of the breach of trust; (6) the reasons for the delay of the beneficiary in suing; (7) change of position by the trustee, including loss of rights against third persons; (8) the death of witnesses or parties; (9) hardship to the beneficiary if relief is not given; (10) hardship to the trustee if relief is given.

Among the "other" factors, which, in equity should be considered is the fiduciary duty which a trustee owes to a beneficiary and the right of the trustee to relieve itself of liability by means of a judicial accounting or to obtain the instructions of the court. A trustee may obtain the instructions of the court where necessary for its protection. *Worrell v. Beach*, 63 R.I. 95, 98, 7 A.2d 666, 667 (1939), *Rhode Island Hospital Trust Co. v. Taffinder*, 92 R.I. 259, 265, 168 A.2d 160, 163 (1961). Restatement (Second) of Trusts § 259 (1959). The Trustees' fiduciary responsibility demands that it treat a beneficiary with utmost fairness and frankness. Therefore, the defense of laches by a trustee necessarily involves whether a trustee, possessed of particular knowledge of the trust administration, has made available to a beneficiary knowledge or information that would alert the beneficiary to a possible breach of trust. There is no evidence that the Trustee communicated any information to the Plaintiff beneficiaries which might, by any stretch of the imagination, cause the beneficiaries to question the Trustee's administration.

Rhode Island law does not require testamentary trustees to file periodic accountings. The trustee's duty is, therefore, to account at reasonable times. Fifty-

five years passed without an accounting of this Trust. This action was brought in 1974, and an accounting was undertaken as a result of the demand of the beneficiaries. Considering the failure of the Trustee to provide information that might cause a beneficiary to question the Trust administration, the failure of the Trustee to itself seek either instructions or a judicial accounting and the ten specific factors set forth in Restatement (Second) of Trusts § 219(1) comment a (1959), the beneficiary Plaintiffs are not guilty of laches.

The Plaintiff beneficiaries are William A. Dennis, III, who was born in 1945, Robert B. Dennis, who was born in 1947, and Robert B. Dennis, as substitute Administrator c.t.a. of the Estate of Alice M. Dennis, who was appointed on July 12, 1979. Alice M. Dennis, the mother of William Dennis, III and Robert B. Dennis, who deceased June 1, 1972, was the daughter of Robert J.B. Sullivan. Robert J.B. Sullivan was a child of the decedent, Alice M. Sullivan who died January 5, 1929. Alice M. Sullivan was an income beneficiary from the decease of their father in 1929, until her decease in 1972. At the time of her decease, she was the sole income beneficiary, the other three children of Alice M. Sullivan having then deceased without issue. Thus, in 1972, Plaintiffs William Dennis III and Robert B. Dennis became the only income beneficiaries and presumptively the only remaindermen of the Trust if they survive to October 29, 1991.

William A. Dennis, Jr., father of Plaintiffs William and Robert Dennis purchased a $5/128$ interest in the Alice Building with his mother Theresa Dennis for $36,000 in 1953. He was a Plaintiff in this action both as Executor of his wife's estate and alleging a separate violation by the Defendant as his agent in the management of his interest in the Alice Building. William Dennis, Jr. deceased October 9, 1978, during the pendency of this action.

The Trustee argues that William Dennis III and Robert B. Dennis are guilty of laches "since they were well aware through their mother and father of the retention of

that real estate investment long before their mother died (in 1972)." Not only does this contention fall short of the mark, with respect to a breach of trust which happened in 1950, it also lacks evidentiary support.

Although the breach of trust occurred twenty-five years before suit was brought, Plaintiffs did not know and had no reason to know of the breach until 1972. For most of the twenty-five year period, Plaintiffs were minors with only future interests. Plaintiffs acted promptly to raise the issue of a breach of trust and their failure to bring suit earlier is totally justified. There is no evidence that the Trustee changed its position in reliance upon the failure to bring suit, and, there is no suggestion that the decease of witnesses has impaired the Trustee's defense. The balance of hardship tips decidedly in favor of the beneficiaries. The defense of laches is without merit.

■ Other claims remain for disposition. On behalf of the Estate of Alice M. Dennis, income beneficiary from 1929 to 1972, the Administrator, c.t.a. of her estate seeks damages. Since the evidence is that the Trustee consciously preferred the income beneficiaries over the interest of the remainder interest, this claim is without merit.

■ A claim is also made on behalf of Theresa Dennis with respect to her individual ownership of a 5/128 interest in the Alice Building purchased in 1953 for $36,000 and sold in 1979 for $15,470. The Defendant acted as her agent in the management of her interest. There is no evidence of a breach of the agency relationship between Theresa Dennis and Defendant. Theresa Dennis owned her interest outright and she sold it, apparently willingly.

Plaintiffs also seek to surcharge Defendant with respect to a payment of $100,000 made to the Defendant as agent for the owners of the Alice Building, in connection with the 1927 lease of the building. The 1927 lease agreement required the lessee to deposit the sum of $100,000, in order to assure that the lessee would make alterations to the building and perform the other covenants of the lease agreement. The balance of funds not expended for alterations was to be invested by the Defendant and the income was to be paid to the lessee. In response to an interrogatory seeking an explanation of the disposition of the fund, the Defendant responded:

"It is believed that the fund was deposited and was used for alterations. None of the fund (sic) remains on hand. Details of use not known and records of use not located."

■ While it is likely that the fund was expended for alterations, there is no evidence of that fact. Since record keeping is a vital function of the trust responsibility, doubts concerning the application of the fund must be resolved against the Trustee. 76 Am.Jur.2d Trusts § 508 (1975). The Trustee must be charged with possession of one fourth of the fund as owner of a one fourth interest in the property. The Plaintiffs contend that they are entitled to the fund plus interest from the time of receipt. However, had the fund been properly used to compensate the Trust for a failure to make payment of rent, the proceeds would have been distributed as income to the income beneficiaries, none of whom, except the estate of Alice M. (Sullivan) Dennis, are Plaintiffs in this action. Although Alice M. (Sullivan) Dennis, became an income beneficiary in 1929, the Trustees' management of the Trust, which preferred income beneficiaries, surely resulted in the receipt of income in excess of what could be expected and her estate has no basis to claim a loss. The lease agreement provided for a yearly rental of $75,000 beginning in 1934, for the first ten year period of the lease. This rental was reduced by agreement to $55,000 in 1934 and $65,000 in 1935. If the fund had been applied in its entirety to satisfy the original agreed rental, all of the fund would have been distributed to the income beneficiaries by 1936. Current income beneficiaries and remaindermen would have not shared in the distribution. On the other hand, the Defendant should not have the benefit of an assumption that it did what it should have done in the absence of records, which it was required to keep, but which it

cannot now produce. Hence, the Defendant will be surcharged an additional $25,000 to be added to corpus on the assumption that the funds should have been used to improve the value of the property and would have resulted in an increase in the amount which it received upon the sale of the property in 1979. Additionally, simple interest will be added at the rate of 4%, for a total of $28,000. Although this solution is not without legitimate criticism, it is a fair and equitable method of allocating responsibility and benefit in a very muddled situation.

The Plaintiffs also seek to surcharge the Defendant for breach of its duty of loyalty on the basis of mortgages which the Trustee as a bank granted to lessees secured by the lease, its appointment as agent for all the owners of the Wheaton-Anthony and Alice Buildings, the deposit of all rental payments into accounts in the Defendant-bank, the rental by the Defendant as a bank of trust property, and the acceptance by the Defendant as trustee of the nominee trust of the Alice Building. Perhaps some or all of these responsibilities placed the Defendant in a conflict with its duty to administer the Trust solely in the interest of the beneficiaries. *See Sinclair v. Industrial National Bank of Providence,* 89 R.I. 461, 469, 153 A.2d 547, 552 (1959); *Montaquila v. Montaquila,* 85 R.I. 447, 453, 133 A.2d 119, 122 (1957); Restatement (Second) of Trusts § 170 (1959). The clearest case is the granting of mortgages in which the Defendant as a mortgagee bank took an assignment of rents. *See Point Trap Co. v. Manchester,* 98 R.I. 49, 54, 199 A.2d 592, 596 (1964). What is decidedly lacking is any evidence from which the loss to the Trust might be calculated or evidence of the profit, if any, which accrued to the Defendant as a bank as a result of these transactions. There is some evidence of the commissions paid to the bank at different periods of time as rental agent. No real effort, however, has been made to itemize the cost to the Trust or the benefit to the Trustee as a measure of the damages sustained. It should not be the duty of the Court to ferret out this information from among the hundreds of exhibits and the hundreds of pages of Court filed documents, if, indeed, there is such evidence. In the absence of specific proof, no damages will be awarded, and this makes unnecessary a discussion of whether or not there is a breach of the duty of loyalty.

Plaintiffs contend that the Trustee should be denied compensation because of its failure to completely comply with its responsibilities as Trustee. This issue is committed to the discretion of the Court. Restatement (Second) of Trusts § 243 (1959). Plaintiffs rely on *Haas v. McGann,* 64 R.I. 133, 11 A.2d 284, 289 (1940), which involved a total failure to execute the trust. There is no evidence that the Trustee did not act in good faith. If anything, the fault lies with the overwhelming desire of the Trustee to please the income beneficiaries. Indeed, no charge was made by the Trustee to principal for its compensation until 1968. In 1968, the Trustee began to allocate 25% of its commissions against principal, and that was based on the 1920 tax assessed values of the properties. There is no doubt that the fees charged were reasonable in terms of the income collecting and disbursing functions of the Trustee. A disallowance of fees would be a windfall to the current beneficiaries and the Court has already provided for making good any loss to the Trust. There is no sound reason for a disallowance of fees paid.

Furthermore, there is no evidence which would support punitive damages as demanded by Plaintiffs, assuming that punitive damages are available in this action. There is absolutely no evidence of malice or bad faith on the part of the Trustee. Punitive damages are therefore denied. *T. & S. Service Associates, Inc. v. Crenson,* 505 F.Supp. 938, 945 (D.R.I.1981); *Holmes v. Bateson,* 434 F.Supp. 1365, 1390 (D.R.I. 1977); *Berberian v. New England T. & T. Company,* 117 R.I. 629, 634, 369 A.2d 1109, 1112 (1977).

The only remaining issue which has been raised, although it would be misleading to state that the issue has been briefed,

is the Plaintiffs' demand that the Trustee be removed. As stated in *Petition of Statter,* 108 R.I. 326, 335, 275 A.2d 272, 276 (1971):

> When the ill feeling has reached the point that it interferes with the administration of the trust, the trustee may be removed even though the charges of his misconduct are either not made out or greatly exaggerated.

There is no evidence of ill feeling eminating from the Trustee. This action does represent a broad based, all out, assault upon the actions of the Trustee which the Court has found has some justification, and which in part is chimerical. The Trustee has been charged with violations of practically every duty which a Trustee owes to a beneficiary. On the other hand, there is no doubt that the Trustee is competent to administer the Trust into the future. The clear mandate implicit in this decision is that the Trustee which is charged with the responsibility to administer a Trust must take affirmative action, whether or not it meets with the approval of some of the beneficiaries, to respond to its duty. It can be expected that future Trust transactions will be scrutinized by the beneficiaries with the equivalent of a high powered microscope. The circumstances are not likely to produce the cooperative effort of Trustee and beneficiaries so essential to the smooth functioning of the Trust and the satisfaction of the settlor's intent. It is in the interest of both the Trustee and the beneficiaries that a Successor Trustee be appointed. Indeed, the Trustee has not expressed a preference as to whether or not it wishes to remain a Trustee of this Trust.

Accordingly, the parties are directed to nominate two corporate Trustees, each qualified to transact trust business within the State of Rhode Island, within sixty days of the date of this Opinion. The Court will select a Successor Trustee from those nominated. The parties are cautioned to nominate only Successor Trustees who have expressed a willingness to serve.

In summary, the Trustee is surcharged the amount of $393,781.67 to be added to the principal of the Trust, its accounts for the period of 1920 to December 31, 1982, are otherwise allowed, and the Trustee is released and relieved of any or all other liability for its administration of the Trust from 1920 to December 31, 1982.

Plaintiff will prepare and present a form of judgment.

SO ORDERED.

## APPENDIX A

### RECEIPTS

|  | Oct. 8, 1920 to Dec. 31, 1977 | Jan. 1, 1978 to May 12, 1978 |
|---|---|---|
| Rec'd. | $ 350,070.00 | $312,163.32 |
| Add to Principal | 36,380.00 | |
| Gains | 2,223.19 | |
| Income rec'd. | 1,090,947.46 | 4,609.92 |

### CHARGES

|  |  |  |
|---|---|---|
| Losses | 69,087.08 | |
| Principal Expense | 5,480.31 | 245.79 |
| Items Liquidated w/o Loss | (132,315.13) | |
| Bal. of Prin. | 314,105.80 | 313,860.01 |
| Expense (income) | 69,041.66 | 189.50 |
| Payment Beneficiaries | 1,023,548.28 | 2,077.82 |
| Bal. of income | −1,942.48 | 400.12 |

### RECEIPTS

|  | May 13, 1978 to Dec. 31, 1978 | January 1, 1979 to December 31, 1982 |
|---|---|---|
| Rec'd. | $314,260.13 | $309,566.53 |
| Add to Principal | | 41.51 |
| Gains | 20.00 | 13,020.95 |
| Income Rec'd. | 6,854.77 | 63,700.65 |

### CHARGES

|  |  |  |
|---|---|---|
| Losses | 1,669.96 | 156,898.61 |
| Principal Expense | | 2,999.56 |
| Items Liquidated | 2,674.21 | |
| w/o Loss | (1,100.00) | |
| Bal. of Prin. | 309,535.84 | 162,700.13 |
| Expense (Income) | 122.98 | 3,944.17 |
| Payment to Beneficiaries | 7,101.22 | 59,787.16 |
| Bal. of Income | 30.69 | .01 |

## SUPPLEMENTAL OPINION

Following the filing of the Opinion of the Court on May 20, 1983, Defendant Trustee moved, in accord with the provisions of Fed.R.Civ.P. 52(b), to modify the Opinion with respect to a surcharge of $28,000. The surcharge was imposed because of the failure of the Trustee to account for a portion of a deposit of $100,000 in 1927. Initially, Plaintiffs opposed this motion. Thereafter, Plaintiffs filed a motion seeking an order amending this Court's Opinion "to the extent of ... (b) reducing the damages awarded Plaintiffs herein by $28,000 to a total award of $365,781.67." The affidavit filed in support of the motion, in part states:

> 3. Regarding the issue of the so-called "lost and found" deposit upon the Alice Building, Plaintiff's counsel have reviewed, on July 18, 1983, the documents produced by Defendant (exhibit C hereto). As a result of such review Plaintiffs are now satisfied that the Defendant can account for the entire $100,000 tenant deposit in 1927 upon the lease of the Alice Building. Plaintiffs therefore concur that the court may amend its findings of May 20, 1983 to eliminate any reference to damages arising from the loss of such deposit or the records thereof.

Although the Plaintiffs have referred to an award to them of damages, the reference is obviously to the $28,000 surcharge that the Court directed be added to the Trust, of which the Plaintiffs are current income beneficiaries. With the understanding that the parties are in agreement that Defendant should not be surcharged with respect to the 1927 deposit concerning the Alice Building, the Court grants both the Plaintiffs' and the Defendant's motion to modify its Opinion. The Opinion is hereby modified to the extent that Defendant Trustee is surcharged the amount of $365,781.67 instead of the amount of $393,781.67 as stated in this Court's Opinion of May 20, 1983.

Plaintiffs will prepare and present a form of judgment.