Louis DONATO, in his capacity as Administrator of the Estate of Gloria Zinni, and as Natural Guardian of the Heir–at–Law, and under certain will and Trust Documents, Dana Zinni Donato, and as Trustee of the Estate Domenic A. Zinni, Plaintiff,

v.

BANKBOSTON, N.A., successor to Rhode Island Hospital Trust National Bank, and James Winoker, in their capacity as Co–Executors and/or individually, and as Co–Trustees for the Trust of Domenic A. Zinni, and Richard H. Pierce, Esq., as Partner of the Law Firm of Hinckley, Allen & Snyder, and John Doe and Jane Doe, partners in said Firm, Defendants.

No. 97–283–L.

United States District Court,
D. Rhode Island.

Aug. 21, 2000.

Arlene Marie Violet, Providence, RI, for Defendants.

Steven E. Snow, Brian Clifford Newberry, Partridge Snow & Hahn, Providence, RI, for BankBoston, N.A.

Stephen J. Reid, Jr., Staci L. Sawyer, Blish & Cavanagh, Providence, RI, for Winoker.

## DECISION AND ORDER

LAGUEUX, District Judge.

After spending eight years in the judicial system, almost three of which have been spent in this Court, this case is ready for disposition after a bench trial. The sole issue remaining before this Court is whether defendants BankBoston and James Winoker committed a breach of trust in their handling of a particular trust asset, namely, stock in CML Group, Inc. (the maker of Nordic Track equipment among other things). This Court concludes that they did not.

### I. Travel of the Case

Plaintiff Louis Donato ("plaintiff") is the executor of the estate of Gloria Zinni and the guardian of Gloria's daughter and heir Dana Zinni Donato. This case essentially involves allegations that defendants mishandled in various ways the affairs of Gloria Zinni's father, Domenic Zinni, thereby depriving her estate, and as a result her

heir, of various benefits. During the relevant periods, the Rhode Island Hospital Trust National Bank, to which defendant BankBoston ("defendant Bank") is successor,[1] and James Winoker ("defendant Winoker") were co-executors of Domenic Zinni's estate and co-trustees of an inter-vivos trust ("the Trust") executed by Domenic Zinni. The law firm of Hinckley, Allen & Snyder, and Richard Pierce, as a partner in that firm (together "the law firm defendants"), represented Domenic Zinni on a variety of matters.

The case began when plaintiff filed suit in the Rhode Island Superior Court in 1992, asserting claims of breach of fiduciary duty, breach of trust and legal malpractice based on a variety of actions taken by defendants. In 1997, plaintiff filed a Third Amended Complaint in state court, which asserted several new claims. One of these was a legal malpractice claim against the law firm defendants, alleging mishandling of the beneficiary designation provision of a profit-sharing plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Because the claim "related to" ERISA, defendants removed the case to this Court. This Court, in an unpublished opinion dated September 29, 1998, denied plaintiff's motion to remand, *see Donato v. Rhode Island Hosp. Trust Nat'l Bank*, 52 F.Supp.2d 317, 323 (D.R.I.1999)(Appendix A), and retained jurisdiction over the remaining state law claims, not relating to ERISA, pursuant to supplemental jurisdiction.

On April 12, 1999, plaintiff made a motion for this writer to recuse himself from the case. *See id.* at 318. On June 15, 1999, this writer denied that motion, *see id.* at 323, and the case was finally poised for trial.

Because plaintiff's allegations included both legal and equitable claims, a jury was impaneled on January 20, 2000. The trial began on February 1, 2000.

At the close of plaintiff's evidence, all defendants made motions for judgment as a matter of law on all claims. In response, the Court first noted that plaintiff's Fourth Amended Complaint, which had been filed after the motion to remand was denied, "like its predecessors, is a mishmash of claims without separate counts, one moment allegedly suing the executors for something, but then making a claim against the co-trustees, and then making a claim against the law firm." Trial Transcript, February 10, 2000, p. 2. The Court also noted that the presentation of evidence at trial by plaintiff had similarly been a "mishmash" which failed to clarify the issues. *Id.* at 9. The Court thus attempted to delineate the claims being made in order to deal effectively with defendants' motions. A brief recitation of the Court's conclusions in this regard will be helpful in the following discussion and in drafting a final judgment in this case.

The Court extrapolated the following nine claims from plaintiff's Fourth Amended Complaint and presentation of evidence: 1) a claim of malpractice against the law firm defendants for their handling of the ERISA profit-sharing plan's beneficiary designation provision, 2) a claim of breach of trust against defendant Bank and defendant Winoker for their handling of a particular trust asset, namely, stock in CML Group, Inc. ("the CML stock"), 3) a claim of breach of trust against defendant Bank and defendant Winoker for failure to release trust assets to pay off certain mortgages on property located in Warwick, 4) a claim of breach of fiduciary duty against defendant Bank and defendant Winoker as co-executors for the handling of the appraisals of certain estate assets, namely, stock in B.B. Greenberg Company and three "Union Station" partnerships, 5) a claim of breach of fiduciary duty against defendant Bank and defendant Winoker as co-executors for the failure to rescind Do-

---

1. Subsequent to the trial, on April 13, 2000, this Court approved defendant Bank's motion to substitute Fleet National Bank as its successor.

menic Zinni's stock purchase of the B.B. Greenberg stock, 6) a claim of breach of fiduciary duty against defendant Bank and defendant Winoker as co-executors for relinquishing Domenic Zinni's interest in the three Union Station partnerships, 7) a claim of breach of fiduciary duty against defendant Bank and defendant Winoker as co-executors for failing to collect Winoker's debt to the estate, 8) a claim of breach of fiduciary duty against defendant Bank and defendant Winoker as co-executors for failing to pay off the Warwick mortgages, and 9) a claim of breach of fiduciary duty against defendant Bank and defendant Winoker as co-executors for allegedly interfering with the probate proceedings by pursuing some sort of foreclosure proceedings on the Warwick properties. In summary, there was one claim against the law firm defendants, two claims against defendant Bank and defendant Winoker as co-trustees and six claims against defendant Bank and defendant Winoker as co-executors. *See id.* at 2–15.

The Court addressed the malpractice claim first. The Court concluded that the law firm defendants were entitled to judgment as a matter of law on that claim, because plaintiff had failed to establish a necessary element of a legal malpractice claim, namely, a lawyer/client relationship between the law firm defendants and Gloria Zinni, Dana Zinni Donato or the plaintiff. *See Church v. McBurney*, 513 A.2d 22, 24 (R.I.1986).[2] Because the legal malpractice claim was the only claim to be decided by the jury, the Court next discharged the jury. In addition, since the malpractice claim, the only claim which involved the ERISA profit-sharing plan, was the only basis for federal jurisdiction, the Court noted that it could exercise its discretion to remand the remaining state issues back to state court or it could continue to exercise supplemental jurisdiction

over those issues. *See* 28 U.S.C. § 1367(c)(3)(1994).

However, in determining whether or not to retain jurisdiction, the Court recognized a jurisdictional defect that had previously gone unnoticed in the course of litigating these confusing, overlapping claims. Specifically, the six claims against the co-executors of Domenic Zinni's estate were in essence claims regarding the handling of a will and/or an estate, and as such were subject to the exclusive jurisdiction of the Probate Court. *See Dugdale v. Chase*, 52 R.I. 63, 157 A. 430, 430–431 (1931)("The probate court has exclusive original jurisdiction in matters relating to the probating of wills. The jurisdiction of the superior court in such matters is only appellate.") The Court reasoned that such claims were not properly before a federal court exercising supplemental jurisdiction because the claims could not have originally been brought in Rhode Island Superior Court. *See, e.g., McKibben v. Chubb*, 840 F.2d 1525, 1529 (10th Cir.1988)(" 'The standard for determining whether federal jurisdiction may be exercised is whether under state law the dispute would be cognizable only by the probate court.' ")(quoting *Lamberg v. Callahan*, 455 F.2d 1213, 1216 (2d Cir.1972)). *See also Kittredge v. Stevens*, 126 F.2d 263, 267 (1942)(applying Mass. law)("We have found no authority for the position that a federal court has jurisdiction over a case which would involve an examination of the general administration of [an estate] by a state probate court.").

Defendant Bank and defendant Winoker, anxious to adjudicate these issues after years in both the state and federal systems, argued that the claims could indeed have been brought in Rhode Island Superior Court pursuant to R.I. Gen. Laws § 8–2–13, and that, therefore, this Court's ex-

---

**2.** The Court noted that there were potentially other malpractice claims being made against the law firm defendants, but it could not decipher what those were. However, to the extent that there were additional malpractice

claims asserted, they would have been disposed of in the same manner as the claim regarding the ERISA plan because they would have suffered from the same defect, namely, lack of an attorney/client relationship.

ercise of supplemental jurisdiction was proper. That section establishes the exclusive jurisdiction of the Superior Court over actions in equity and further provides that "[i]f an action is brought in the superior court which represents an attempt in good faith to invoke the jurisdiction conferred by this section, the superior court shall have jurisdiction of all other actions arising out of the same transaction or occurrence[.]" R.I. Gen. Laws § 8–2–13 (1997). Because the claims against them as trustees were clearly within the exclusive equity jurisdiction of the Superior Court, defendant Bank and defendant Winoker argued that the claims against them as co-executors thus were properly brought in Superior Court, notwithstanding the otherwise exclusive jurisdiction of the Probate Court.

The Court agreed that the breach of trust claims were properly brought in the Superior Court. The Court also agreed that the breach of trust claim involving the Warwick mortgages arose out of the "same transaction or occurrence" as two of the claims against the co-executors; namely, the claim involving the payment of the Warwick mortgages and the claim involving the alleged interference of defendant Bank with the probate proceedings. Therefore, the Court concluded that jurisdiction over those claims was proper in the Superior Court. As for the remaining four claims against the co-executors, however, the Court concluded that they involved different transactions from both breach of trust claims. Therefore, the Court dismissed those claims for lack of subject matter jurisdiction.

The Court then concluded that it would exercise its discretion to retain jurisdiction over the remaining two claims against defendants as co-executors and the remaining two claims against defendants as co-trustees, in the interest of preserving time and judicial resources. Reaching, then, defendants' motions for judgment as a matter of law on the merits of those four claims, the Court concluded that defendant Bank and defendant Winoker were entitled to judgment as a matter of law on three of the four claims, namely, the two breach of fiduciary duty claims and the breach of trust claim regarding the Warwick mortgages. As to the fourth claim, regarding the CML stock, the Court denied the motion for judgment as a matter of law and proceeded with a bench trial, to gather further evidence on the only remaining issue in the case. The Court did not, however, enter judgment on any of the claims it had addressed, in order to avoid a piecemeal appeal.

The bench trial concluded on February 11, 2000 and the parties filed post-trial memoranda. The Court is now ready to rule on the merits of the remaining breach of trust claim regarding the handling of the CML Stock.

## II. Standard in Bench Trial

Pursuant to Federal Rule of Civil Procedure 52(a), this Court may enter judgment following a trial without a jury. *See* Fed. R.Civ.P. 52(a). In crafting a decision following a bench trial, the Court "shall find the facts specially and state separately its conclusions of law thereon[.]" *Id.*

## III. Findings of Fact

On or about March 18, 1986, Domenic Zinni executed the Trust, which names his daughter Gloria as one of the beneficiaries and defendants Bank and Winoker as co-trustees. The Trust is an amendment of an earlier trust agreement executed on June 2, 1977. The Trust establishes Domenic Zinni as the active manager of the Trust assets during his lifetime, and defendants as the active managers only in the event of Domenic Zinni's death or incapacitation. In June, 1990, Domenic Zinni suffered a stroke and lapsed into a coma. At that time, defendants assumed active management of the trust assets. Domenic Zinni subsequently died on February 9, 1991.

At the time defendants assumed management of the Trust, the Trust contained

50,000 shares of CML Group Convertible Debentures with a 7.5% rate and a maturity date of July 1, 2012, which had been added to the Trust by Domenic Zinni sometime prior to his incapacitation. In September of 1990, this investment had a market value of $34,625 and constituted 1.37% of the total market value of the Trust's assets. Approximately six months after Domenic Zinni's death, the debentures were converted to CML stock. On July 31, 1992, the stock had a two-for-one split and on June 20, 1993, the stock had a three-for-two split. Subsequent to this activity, the trust held 9600 shares of the CML stock. In September, 1993, the CML stock constituted approximately 38% of the total market value of the Trust's assets and was trading at approximately $20 per share.

By October 31, 1993, the percentage of the Trust's total market value represented by the CML stock had grown to 69.2%. There were two reasons for this expansion. During the month of October, the value of the stock had been increasing, reaching approximately $30 per share by the end of the month. In addition, in October, the trustees expended several liquid assets of the Trust in order to pay various expenses.

On November 10, 1993, defendants sold 2400 shares (25% of the total CML stock holdings) at $31.27 per share, generating proceeds of $75,048.[3] Coincidentally, the stock hit its high price of about $32 per share two days later. Subsequent to the sale, the percentage of the Trust's total market value represented by the CML stock dropped to 49.17%. On February 17, 1994, defendants sold another 2400 shares at $19.02 per share, generating proceeds of $45,658.

On March 1, 1994, plaintiff became the trustee. On March 31, 1994, the CML stock reached 70.25% of the total market value of the trust. On April 6, 1994, plain-

tiff sold 950 shares at $17.36 per share, generating proceeds of $16,491. On April 15, 1994, plaintiff sold 1500 shares at $16.15 per share, generating proceeds of $24,224. Finally, on July 15, 1994, plaintiff sold the remaining 2350 shares at $8.55 per share, generating proceeds of $20,-103.57.

## IV. Conclusions of Law

### A. Plaintiff's Specific Claim

This Court is again compelled to clarify plaintiff's claims, as they were not explicitly articulated during closing argument or in his post-trial memorandum. Plaintiff apparently seeks to hold defendants liable for breach of trust on one or both of two theories: 1) that defendants should not have kept the CML stock at all because it was not "trust quality," and 2) that defendants should not have let the CML stock grow to constitute over 69% of the Trust's market value. Plaintiff claims that, because of these considerations, defendants should have sold all of the stock on November 10, 1993, when they sold the first 25% of the stock. Plaintiff calculates his damages, under both theories, as $118,695, which he claims is the difference between the proceeds the Trust would have realized had all of the CML Stock been sold on November 10, 1993 and the proceeds actually realized from the subsequent sales of the remaining three quarters of the stock.[4]

### B. Legal Standard

The parties first argue over the standard under which defendants' actions should be reviewed. Plaintiff argues that the "prudent man" rule applies, and argues further that the "prudent man" rule includes an absolute duty to invest only in particular kinds of assets and an absolute duty to diversify. Defendants argue that they were under no such absolute duty and

---

**3.** Plaintiff's exhibit 93 calculates the proceeds from this sale at $75,057. Since the calculation utilizes the same figures, this Court assumes it is a typographical error.

**4.** This calculation is correct using the $75,057 figure for the first sale. Using the $75,048 figure, plaintiff's calculation of damages would yield $118,667.

further that their actions with regard to the CML stock can only trigger liability if they were guilty of an "abuse of discretion."

■ At the time of defendants' challenged actions, plaintiff is correct that the "prudent man" standard applied to the behavior of trustees as a matter of common law in Rhode Island:

'Trustees must be prudent and vigilant and exercise a sound judgment. They are to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as probable safety of the capital to be invested.'

*Dennis v. Rhode Island Hosp. Trust Nat'l Bank,* 571 F.Supp. 623, 631 (D.R.I.1983)(quoting *Rhode Island Hosp. Trust Co. v. Copeland,* 39 R.I. 193, 98 A. 273, 279 (1916)), *aff'd,* 744 F.2d 893 (1st Cir.1984). *See also* Restatement (Third) of Trusts (Prudent Investor Rule) § 227 (1992).[5] Plaintiff is also correct that the prudent investor rule generally imposes a duty on trustees to invest only in "trust-quality" investments and a duty to diversify the trust assets. *See generally* Restatement (Third) of Trusts (Prudent Investor Rule) § 227 (1992). Since there is very little authority in Rhode Island addressing the scope of its prudent man rule, however, it is unclear whether either of these duties is absolute, as plaintiff claims. *Cf. id.* at § 227(b)("the trustee has a duty to diversify the investments of the trust unless, under the circumstances, it is prudent not to do so").

■ Defendants are correct, however, that whatever the scope of the prudent man rule in Rhode Island, it is a default rule that can be altered by the terms of the trust instrument. *See id.* at § 228.

Defendants argue that two separate provisions of the Trust alter the prudent man rule in this case. Specifically, Section 12 of the Trust provides, in relevant part,:

The trustees, in addition to and not in limitation of all common law and statutory authority, shall have the broadest discretionary powers of investment, reinvestment and management over each trust established under this trust agreement and, without qualifying the foregoing generality, shall be entitled (without applying to any court and without liability except in cases of negligence or bad faith) in their discretion:

12.1 To purchase and/or retain any securities or other property, including ... (iv) securities not ordinarily considered appropriate for trust investment ... and in each case in amounts which normally would be regarded as disproportionately large for trust investments.

Section 13.2 provides, in relevant part,:

I specifically authorize the trustees to hold and retain any property delivered to them by me or subsequently acquired by them pursuant to my written instructions, notwithstanding any lack of diversification in the investment of such property or any disproportionate investment thereof in common stock or other equities and the trustee shall not be liable for any loss or depreciation occasioned by such retention.

Defendants argue that these sections relieve them of any absolute duty regarding the quality of investments or diversification and further establish that their investment decisions should be reviewed for an "abuse of discretion" only.

The Court will address the effect of each section in turn. As there is scant precedent for such interpretation in Rhode Island, the Court will use the Restatement of the Law of Trusts as a guidepost.

---

5. The "prudent investor rule" has since been codified in Rhode Island at R.I. Gen. Laws

§ 18–15–1 *et seq.*

■ Section 12, in trust parlance, is a "permissive provision." Restatement (Third) of Trusts (Prudent Investor Rule) § 228 cmt. f (1992). Specifically, by authorizing investment in "securities not ordinarily considered appropriate for trust investment" and other investments "in each case in amounts which normally would be regarded as disproportionately large for trust investments," the Trust relieves the co-trustees of any absolute duties regarding trust quality investments and diversification which may exist under state law. *See id.* However, "the fact that an investment is permitted does not relieve the trustee of the fundamental duty to act with prudence." *Id.* Thus, standing alone, a permissive provision does not relieve trustees from scrutiny under a "prudence" standard for their investment decisions; it means only that a trustee cannot be found to have acted imprudently *per se* for holding a particular type of investment or for holding a disproportionately large amount of one investment.

However, there are two additional aspects of Section 12 which nonetheless arguably insulate defendants from "prudence" review.

■ First, Section 12 grants defendants "the broadest discretion" in making investment decisions. In some situations, the grant of extended discretion "broadens the trustee's latitude in investment matters[,]" rendering the trustee liable for investment decisions only in the event of an abuse of that discretion. *Id.* at § 228 cmt. g. Such grants of discretion, however, are to be "strictly construed" and "do not ordinarily result in a broadening of the [prudent man] standard[.]" *Id.* According to the Restatement (Third) of Trusts, the words "absolute discretion" or "sole and uncontrolled discretion" are examples of language having this effect. *Id.* Under a strict construction, the words "broadest discretion" do not have the same meaning as "absolute" or "uncontrolled" discretion. In addition, given the context in which the language is found, particularly the narrow exculpatory clause discussed below, this Court will not construe the language to alter the scrutiny with which defendants' actions are to be judged from a "prudence" review to an "abuse of discretion" review.

■ Second, Section 12 contains an "exculpatory provision" by granting investment discretion "without liability except in cases of negligence or bad faith." An exculpatory provision prohibiting all liability normally relieves trustees from liability for breach of trust except when "committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary[.]" Restatement (Second) of Trusts § 222 (1959). Curiously, though, this provision exculpates defendants only in the absence of *"negligence* or bad faith." (Emphasis added). Although the meaning of the word "negligence" in this context is not entirely clear, this language seems to indicate that the trustees actions are to be reviewed for more than just bad faith or reckless indifference. This Court concludes that because the exculpatory provision utilizes the word "negligence," it does nothing to alter the degree of scrutiny required under the "prudent man" rule.

Therefore, under Section 12, defendants cannot be liable for investing in non-trust quality or non-diverse assets *per se,* but may be liable if the particular investment involved was nonetheless an imprudent decision given the circumstances.

■ Section 13.2 specifically authorizes the retention of investments originally contained in the Trust, and in disproportionate amounts, and contains an exculpatory provision relieving the co-trustees of all liability for such retention. Defendants are correct that such language alters the "prudence" standard and renders them liable for breach of trust regarding investments originally contained in the Trust only in the event of an "abuse of discretion." Restatement (Third) of Trusts (Prudent Investor Rule) § 229 cmt. d (1992). Plaintiff seeks to escape application of this provision under two theories.

First, plaintiff argues that Section 13.2 is inapplicable to defendants' actions in 1993 because that section was applicable only during Domenic Zinni's lifetime. Plaintiff offers no reasoning for his conclusion, which is not surprising as it represents a complete misreading of the Trust. Section 13.1 establishes that defendants were not to assume active management of the Trust until Domenic Zinni's death or incapacitation. The relevant portion of Section 13.2 establishes the scope of defendants' liability *with respect to that active management.*[6] Clearly, the relevant portion of Section 13.2 is only applicable subsequent to Domenic Zinni's death or incapacitation, when defendants were managing the Trust assets. Thus, plaintiff's first argument is untenable.

■ Plaintiff's second argument, however, presents an interesting issue. Plaintiff argues that the CML stock is not in fact an "original" investment in the Trust because, when defendants assumed active management of the Trust, the asset consisted of CML Group convertible debentures rather than common stock. Plaintiff is correct that in some situations, a security substituted for an original security "as a result of a reorganization, recapitalization, or other cause" is not subject to the provisions of a retention clause. M.L. Cross, Annotation, *Construction and Effect of Instrument Authorizing or Directing Trustee or Executor to Retain Investments Received Under Such Instrument,* 47 A.L.R.2d 187 § 10 (1956). Specifically, the substituted security can be retained pursuant to such a clause only if it is "substantially the equivalent of the old [security]." *Id.* In this case, the CML convertible debentures were less risky than the CML stock because holders of debentures, as creditors of the corporation, are entitled to payment before shareholders in the event of dissolution. *See* Black's Law Dictionary 401 (6th ed.1990). Thus, if the "substantial equivalent" test requires a comparable degree of risk in the two investments, the CML stock should not be considered

6. Section 13 reads in its entirety:

13.1 Notwithstanding the foregoing provisions of SECTION 12 [the management provisions], until my death or receipt by the trustees of (i) notice in writing from me that the trustees are to assume complete investment responsibility with respect to the trust estate, (ii) certification in writing from any attending physician of mine that I am no longer physically or mentally able to make decisions with respect to investment of the trust estate, or (iii) notice from my wife, my daughter, or any other appropriate person that my whereabouts has been unknown for a period in excess of thirty (30) days, the trustees shall exercise none of the foregoing powers with respect to sale and investment or reinvestment of the trust estate except in accordance with my written instructions; provided, however, that if at any time the trustees are advised that my death appears to be imminent, the trustees are hereby authorized to purchase United States Treasury bonds which are redeemable at par for the payment of federal estate taxes, and to raise the necessary funds for such purchase either by borrowing for the trust estate or by selling such assets as the trustees deem appropriate.

13.2 The trustees shall have no responsibility or liability for any act done pursuant to my written instructions or for the failure to do any act whatsoever in the absence of such written instructions, and the trustees may conclusively presume that I have remained physically and mentally competent until such time as they receive a physician's certificate as set forth above. No person or corporation, including transfer agents, dealing with the trustees shall be required to inquire as to my competency or as to such instructions but may conclusively presume the existence or occurrence of facts supporting any action of the trustee. I specifically authorize the trustees to hold and retain any property delivered to them by me or subsequently acquired by them pursuant to my written instructions, notwithstanding any lack of diversification in the investment of such property or any disproportionate investment thereof in common stock or other equities and the trustees shall not be liable for any loss or depreciation occasioned by such retention. The trustees are further authorized and empowered to retain uninvested any cash which I may pay over to them and to deposit such cash in a call account with the trustees or otherwise and the trustees shall have no liability for any loss of income thereon.

equivalent and thus should not be subject to the retention clause. *See* Bogert, Trusts & Trustees, § 682, at 126–127 (2d ed.1982)("if in any material respect there has been a change in the nature of the ... risk, security, or priority, the new property ought not to be held under the [retention] authorization clause").

On the other hand, there is no evidence that the company's structure or business activities changed, so that the investments could be said to be "substantially equivalent" from a subject matter standpoint. *See id.* at 125–126 ("If, considering the character of the business to be carried on by the new or revised corporation and the rights and liabilities of the shareholders, the new shares represent substantially the same type of investment, they may be retained under the settlor's authorization."). Even more importantly, the original investment was in *convertible* debentures, which indicates that the investor, in this case Domenic Zinni, was aware that the asset may at some point be converted to equity and, therefore, that he intended for the investment to be considered "original" even after the conversion takes place. These considerations indicate that the CML stock should be considered substantially equivalent to the debentures and therefore covered under the retention clause.

There is no Rhode Island authority on point and there is no authority in any other state that addresses this precise issue. This Court cannot prognosticate as to what the Rhode Island Supreme Court would conclude if faced with this issue. However, it is not necessary to make a prediction because, as will be shown below, plaintiff has utterly failed to prove his claim regardless of whether or not defendants' actions are insulated by the provisions of Section 13.2. Therefore, the Court will err on the side of caution and accept plaintiff's argument that the CML stock does not constitute an original Trust asset.[7] For purposes of this case, then, this Court will assume that Section 13.2 does not operate to alter the standard of review from one of "prudence" to one of "abuse of discretion."

Thus, pursuant to Rhode Island common law and the provisions of the Trust, the issue in this case is whether defendants acted imprudently by not selling all of the CML stock on November 10, 1993.[8]

## C. Application of Standard to Facts

 Plaintiff's assertion that defendants' actions were imprudent rests upon a trial Exhibit detailing trading activity of the CML stock for the relevant periods ("Exhibit 93") and upon the testimony of Grafton H. Willey, III, a semi-retired trusts and estates attorney who testified that he managed assets such as stocks and bonds "[e]very day for the whole period of [his] practice." Trial Transcript, February 9, 2000, p. 6. Plaintiff's theory is that the CML stock's trading activity provided defendants with sufficient warning that the stock should have all been sold on November 10, 1993.

Specifically, Mr. Willey testified that in January 1993, "while [the CML stock price] was still running very strongly, insiders began to sell large blocks of stock, and that is always a warning sign." *Id.* at 38. In addition, the company's sales "took a precipitous drop during 1993 and 4[.]" *Id.* at 39.

Mr. Willey also noted that after the November 12, 1993 peak, the stock price

7. One thing is clear. The decision of defendants to convert the debentures to stock was a boon to the Trust and plaintiff cannot complain about that action.

8. Plaintiff also seems to argue, although not clearly, that defendants had a duty beyond the "prudent man" rule because of representations they made to plaintiff regarding the types of assets that would be kept in the Trust and the degree of diversification. However, there is no authority to suggest that representations made by trustees alter the duties imposed upon them by state law and the trust instrument. This Court will not adopt this novel rule.

began to drop and was "dropping precipitously" just prior to the sale in February of 1994. *Id.* at 37. In addition, "after the November 12 peak, the volume was very, very high for this stock." *Id.* at 41. Mr. Willey testified that "[h]igh volume on a drop ... sends relatively bad news." *Id.* In this case, he concluded, "the volume combined with the price direction ... would be a disaster." *Id.*

 The Court first notes that any trading activity subsequent to the November 10, 1993 sale is irrelevant to an analysis of whether defendants acted prudently on that date. *See Dennis,* 571 F.Supp. at 631 ("the unerring view of hindsight is not to be applied to determine the propriety of [a trustee's] administration of the Trust"). *See also* Restatement (Third) of Trusts (Prudent Investor Rule) § 227 cmt. b. Therefore, the Court will only consider the evidence regarding the sale of CML stock by insiders and the company's declining sales in deciding whether or not defendants should have had the foresight to sell all of the CML stock on November 10, 1993.

As for the sales by insiders throughout 1993, Mr. Willey admitted on cross examination that "there are two reasons why an insider can sell. One, to cut down his investment and to bail out, but the other would be to exercise options." Trial Tr., February 9, 2000 at 84. Although he did not explicitly say so, a fair reading of Mr. Willey's testimony indicates that only the former reason would create a warning to shareholders. When asked if he knew the reason for the insider sales in this case, Mr. Willey indicated that he had no personal or secondary knowledge of the reason. *See id.* However, he testified that when insiders are selling for options, "that makes news as an item." *Id.* Mr. Willey admitted that he was speculating, based on his knowledge that no "headline items" during that period indicated that insiders were selling for options, that the reason for the insider sales was foreboding. *Id.*

As for the alleged "precipitous drop" in sales during 1993–1994, an examination of Exhibit 93 indicates that Mr. Willey's characterization of the company's sales activity is misleading. It is true that the company experienced a drop in sales during 1993. For the second quarter of 1993, sales were $236 million, in the third quarter they were $169 million and in the fourth quarter they were $132 million. However, those figures were an increase from the comparable time periods in 1992: sales were $139 million in the third quarter of 1992 and $99 million in the fourth quarter of 1992. Furthermore, by the second quarter of 1994, sales had rebounded and increased to $292 million. Thus, while there was indeed some sales volatility, sales were clearly not plunging as suggested by Mr. Willey, and in fact were increasing if examined on an annual basis.

The Court concludes that, even if Mr. Willey's testimony was given full weight as "expert testimony"—an issue the Court does not decide—it fails to establish a breach of trust by defendants. As noted above, the "warning" signs that Mr. Willey testified to were not as clear or as dire as suggested by plaintiff, such that a prudent person would have sold all of the stock on November 10, 1993. Furthermore, Mr. Willey admitted on cross-examination that his conclusions were all based upon the assumption that "the market was thick enough to absorb [the stock]." *Id.* at 88. However, when asked whether he could tell whether the market was thick enough at that time, he conceded that he could not. *See id.* This Court agrees with defendant Winoker that defendants were "remarkably lucky" to have sold even a quarter of the CML stock at its high in November, 1993. Trial Transcript, February 11, 2000, p. 15 (testimony of defendant Winoker). The fact that, in hindsight, "they'd have made out like bandits if they'd sold it all[,]" Trial Tr., February 9, 2000 at 86 (testimony of Mr. Willey), cannot render their decision to retain some of the stock imprudent given the circum-

stances with which they were faced on November 10, 1993.

To the extent plaintiff argues that defendants should have sold all of the remaining stock sometime after November 10, 1993, but sometime before plaintiff assumed the role of trustee on March 1, 1994, he still fails to establish a breach of trust. The trading activity during this time period—high volumes of trading and dropping stock price—indicated a "disaster" according to Mr. Willey. *See id.* at 41. However, this evidence does not establish that defendants were obligated to sell all of the remaining stock during that time period. Again, there is no evidence to suggest that the market could have absorbed a sale of all of the remaining CML stock. Furthermore, it is clear that defendants were acting vigilantly in monitoring the stock, as they sold another 25% in February of 1994. Defendant Winoker testified that the reason the co-trustees did not sell more stock at that time was because, given the stock's past volatility, they "thought that there might be a chance that it might come up." Trial Tr., February 11, 2000 at 18. Defendant Winoker also testified that the co-trustees were acting "with an abundance of caution" at that time because they knew that plaintiff was attempting to remove them as trustees. *Id.* Exhibit 93 shows that the CML stock had a history of price fluctuation—going from about $28 per share in April, 1993 to about $20 per share in September, 1993 to about $32 per share in November, 1993 before dropping to about $19 per share in February, 1994. Given this fluctuation and the fact that plaintiff did become the trustee after defendants resigned soon after the second sale, this Court concludes that defendants' decision to sell only another 25% of the CML stock in February of 1994 was not in violation of the "prudent man" standard.

These conclusions with regard to both time periods are further buttressed by the fact that plaintiff did not sell all of the CML stock when he took over as trustee

on March 1, 1994. Plaintiff erroneously argues that his actions once he assumed management of the Trust are relevant only to the issue of mitigation of damages. Because this Court concludes that defendants' actions do not constitute a breach of trust, this Court need not reach the issue of damages. The Court notes, however, that plaintiff's actions as trustee are relevant insofar as plaintiff was under the same "prudence" duty as defendants and was privy to the same "warning signs" as defendants. If it was indeed imprudent to retain the stock past November 10, 1993, plaintiff at least was under a duty, as a "prudent man," to sell the remaining stock before any further loss occurred. That he did not do so belies his assertion that defendants acted imprudently in retaining some of the stock.

## V. Conclusion

For the preceding reasons, this Court finds in favor of defendants on the breach of trust claim regarding the CML stock. All claims in the case that were properly before this Court have now been resolved. In their briefs, defendants allude to the imposition of sanctions on plaintiff and ask for attorneys' fees in this case. Since no formal motions have been made, this Court will not entertain those requests at this time.

The Clerk shall enter judgment as follows forthwith:

1) Dismissing the claim of breach of fiduciary duty regarding the appraisals of the B.B. Greenberg stock and the Union Station partnerships, the claim of breach of fiduciary duty regarding the failure to rescind Domenic Zinni's purchase of the B.B. Greenberg stock, the claim of breach of fiduciary duty regarding the relinquishment of Domenic Zinni's interest in the Union Station partnerships and the claim of breach of fiduciary duty regarding the failure to collect defendant Winoker's debt to the estate without prejudice for lack of subject matter jurisdiction;

2) For defendant law firm and defendant Pierce on the claim alleging legal malpractice; and

3) For defendant Bank and defendant Winoker on the claim alleging breach of trust with regard to the CML Stock, the claim alleging breach of trust with regard to the Warwick mortgages, the claim alleging breach of fiduciary duty with regard to the Warwick mortgages and the claim alleging breach of fiduciary duty with regard to alleged interference in the probate proceedings.

If defendants wish to file a post-judgment motion for sanctions and/or counsel fees against plaintiff and/or plaintiff's counsel, such motion must be filed within thirty (30) days of the date of entry of judgment.

It is so ordered.